CASE 38.—ACTION BY NANCY F. TILTON AGAINST THE EXECUTOR OF HER DECEASED HUSBAND TO SET ASIDE AN ANTE-NUPTIAL CONTRACT AND TO RECOVER A WIDOW'S SHARE IN HIS ESTATE.— November 11.

## Tilton v. Tilton

Appeal from Robertson Circuit Court.

L. P. Fryer, Circuit Judge.

Judgment for defendant. Plaintiff appeals.—Reversed.

1.  Husband and Wife—Ante-nuptial Contracts.—A woman may release her rights in her intended husband's property; but such a contract must be free from fraud or misrepresentation

Tilton v. Tilton.

.or the practice of deceit on the husband's part, must be reasonable in its provisions, and entered into in good faith by both parties, or it may be set aside.

2. Ante-nuptial Contracts—Burden of Proving Fair Procurement.—If an ante-nuptial contract, by which a prospective wife released her rights in her prospective husband's property, shows upon its face that it is unjust or unfair to the wife, the burden is upon the husband or his representatives to show that it was fairly procured, and that the wife was not overreached or deceived in its execution.

3. Ante-nuptial Contracts — Unjust Contract. — In determining the reasonableness of an ante-nuptial contract by which the wife released her rights in her husband's property, the court may consider the adequacy of provision for the wife, the means and ages of the parties, and the wife's understanding of the meaning of the contract.

4. Ante-nuptial Contracts — Unreasonableness — Burden of Proof.—An ante-nuptial contract between a widower of considerable means and a widow who was poor and uneducated, whereby she released her rights in his property, and agreed that any property she might possess at her death should pass to her husband if living, and if dead to his heirs, was so unreasonable and inequitable as to cast upon the husband's representatives the burden of showing that at its execution she understood the nature and extent of her prospective husband's estate, and the value of her marital rights therein, which she was surrendering.

5. Ante-nuptial Contracts. — Evidence held not to show that a woman, when she executed an ante-nuptial contract releasing her rights in her prospective husband's property, and agreeing to give to him or his heirs all her property at her death, fully comprehended and acquisced in its terms.·

ROBT. BUCKNER and JNO. P. McCARTNEY attorneys for appellant.

### AUTHORITIES CITED.

Simpson v. Simpson, 94 Ky. 590-591; Words and Phrases, vol. 8, 7155; Hune v. U. S., 132 U. S. 406-415, 33 L. Ed. 396-397; McNutt v. McNutt, 2. L. R. A. 372; Brooks v. Boooks' Exors., 22 Ky. Law Rep. 555; Maze v. Maze, 99 S. W. 336.

J. J. OSBORNE for appellees.

Tilton v. Tilton.

SAMUEL HOLMES and W. J. OSBORNE of counsel.

AUTHORITIES CITED.

Forwood, &c., v. Forwood, &c., 86 Ky. 114; McNutt v. McNutt, 2 L. R. A. 372; Sanders, &c., v. Miller, &c., 79 Ky. 517; Brown v. Brown's Admr., &c., 80 S. W. 470; Simpson v. Simpson's Exors., 94 Ky. 586; Maze's Exors. v. Maze, 99 S. W. Rep. 336; Brooks v. Brooks' Exors., &c., 22 Ky. Law Rep. 555; Flood v. Pragoff, 79 Ky. 615; Cave's Devisees v. Cave's Heirs, 13 Bush 452; Porshet v. Porshet, 82 Ky. 93; Marksbury, &c., v. Taylor, &c., 73 Ky. 523; James v. O'Driscoll, 2 Ray (S. C.) 101.

OPINION OF THE COURT BY JUDGE LASSING—Reversing.

In 1875 Nimrod A. Tilton, a widower, and Nancy F. Morand, a widow, both residents of Robertson county, Ky., entered into the following contract: "This indenture made and entered into this third day of July, 1875, by and between Nimrod A. Tilton and Mrs. Nancy F. Morand, both of the county of Robertson and State of Kentucky: Witnesseth, that for and in consideration of the said Tilton to lawfully marry the said Nancy F. Morand, said marriage as aforesaid to take place during the year 1875, and the further consideration that the said Tilton has this day given to the said Mrs. Nancy F. Morand one Singer sewing machine, of the value of $80.00 (eighty dollars) and one black mare, of the value of one hundred and fifty dollars ($150.00). Now in consideration of said marriage to take place or happen as aforesaid, and the consideration of said sewing machine and said mare, the receipt of which, that is, said machine and said mare, is hereby acknowledged by the said Mrs. Nancy F. Morand. The said Mrs. Nancy F. Morand for and in consideration of the premises aforesaid, does by these presents release, confirm and forever release

and confirm unto said N. A. Tilton, his heirs and assigns, any dower interest or any other interest whatsoever she may acquire in and to the land or personal property or any insurance policy which the said Tilton may now have upon his life, or any property which he may hereafter acquire in and to which the said Mrs. Nancy F. Morand might be entitled to by reason of said marriage, and it is further understood by the parties hereto that the said N. A. Tilton is in no wise to be responsible for any debts contracted by the said Mrs. Nancy F. Morand after their said marriage or proposed marriage shall have taken place, without the written consent or order of the said Tilton. It is further understood by the parties hereto, that in case there should be no heirs born to the said N. A. Tilton and Mrs. Nancy F. Morand, by reason of said proposed marriage, then whatever property shall remain at the death of Mrs. Nancy F. Morand, shall inure to the said Tilton or his heirs. It is further understood by the parties hereto, that the said Tilton, whenever said marriage shall take place, is to clothe and furnish the necessaries of life to the said Mrs. Nancy F. Morand. In testimony whereof the parties hereto have hereunto set their hands, the day and year first above written." At the date of the execution of this contract Nimrod A. Tilton was living on a farm of some 160 or 170 acres with his four children, the oldest a boy some 17 or 18 years of age, the youngest a girl, possibly 8 or 9 years of age. His wife had died some three months before. Nancy F. Morand had been a widow for some three or four years. She had no children. She had lived in the home of Nimrod A. Tilton, commonly called "Judge" Tilton, for a year or more before the death of his wife, who was quite an invalid. During this time she had at-

Tilton v. Tilton.

tended to the general household duties, in addition to doing the cooking and washing, on a salary of $1.50 per week. After the death of Mrs. Tilton she continued to live in his home and look after the household duties, etc., as she had done before. In the early part of September following she and Judge Tilton were married. They lived together on his farm from that time until his death in 1906. The marriage contract was recorded in the county court clerk's office in October following their marriage. He left a will by the terms of which he gave to his wife the household goods, kitchen furniture, and about $200 in money. By another clause of the will provision is made that, if it is contested, the devisee contesting forfeits all right to any portion of his estate. She renounced the will, and filed a suit in the Robertson circuit court, in which she sought to have canceled and set aside the antenuptial contract above set out, on the ground that it was obtained from her through fraud and misrepresentation, and that it was unjust, inequitable, and a fraud upon her rights as a married woman. She asked that she be adjudged the owner of a widow's share in her husband's estate. Issue was joined upon the allegations of the petition, much proof taken, and upon final hearing the chancellor found against her contention, and dismissed her petition. From that finding and judgment she prosecutes this appeal.

Most all of the proof that has been taken relates to the home life of Judge Tilton, especially during the last few years thereof, when he was sick, afflicted with a cancer, and a good part of the time confined to his bed, almost helpless. Further than to show the devoted, untiring, and constant service which Mrs. Tilton rendered her husband in his sad affliction, this evidence has little bearing on the question before us.

Mrs. Tilton and Dr. M. S. Brown are the only witnesses who have testified concerning the execution of this marriage contract. The testimony of Mrs. Tiltou, under the well-recognized rule, was incompetent, and the trial judge did not err in excluding it from his consideration. The question in issue must therefore be determined by the contract itself, as read in the light of the testimony of Dr. Brown. At the time of the execution of this contract Dr. Brown was engaged in the practice of law at Mt. Olivet, and Judge Kimbrough was associated with him. He testifies that Judge Tilton came to see him about the preparation of this contract, and talked about the matter over with him, and told him how he wanted it drawn; that he in turn discussed the matter with Judge Kimbrough, his law partner, and had Judge Kimbrough draw up the contract as it now is. After it was prepared, Judge Tilton came to town with Nancy F. Morand, and brought her to his (Brown's) room in the hotel, and there he (Brown) read over the contract to her, and explained it to her, and after this was done, it was signed by Judge Tilton and Nancy F. Morand in his presence. The clerk was caused to come to his room and take their acknowledgments. This done, Judge Tilton and Nancy F. Morand left, and returned to his home. Dr. Brown further testifies that he was at that time a friend of her family. That they were poor people, and he took an interest in her, and on this account was careful to see that she understood what she was doing. That both she and Judge Tilton were, at that time, being criticised in the neighborhood because of her staying at his house and taking care of his home and his children for him after the death of his wife, and in the course of his testimony he said: "There was some necessity for the

Tilton v. Tilton.

peace offering in the neighborhood on account of the young people living there, and that she know of this arrangement. She was going to have a permanent home and he got a housekeeper, and Mrs. Morand understood these facts from him, and I did from her, and she could not have been mistaken about it." From this testimony of the doctor it is plain that he was undertaking to satisfy Mrs. Morand of the necessity for the execution of the contract. What he meant by "there being some necessity for the peace offering in the neighborhood," is unexplained and unintelligible, unless it is construed to mean that the execution of this contract was to bring about peace and harmony between Mrs. Morand and the children of Judge Tilton. She pleads that she did not comprehend its terms or the effect thereof; that she was overreached and imposed upon.

It is not difficult to understand how, under the circumstances, this could be done. She was a poor, uneducated woman, dealing with a man whom she was shortly to marry. Recognizing that from the force of circumstances by which she was compelled to labor for a living she had been placed in a position where she was being subjected to severe criticism, and, perhaps, more to avoid this criticism than from any sentimental motive, she had agreed to marry Judge Tilton as the only feasible solution of the difficulty in which the situation had placed them. In this way only could the tongue of the scandal monger be silenced. There then arose, as may be inferred from the testimony of Dr. Brown, the objection to the marriage on the part of the children of Judge Tilton. This objection could only be overcome by the execution of a marriage contract. Under these circumstances we find the judge arranging for a draft of this

contract, and, when it is completed, taking the woman with him to a room in the hotel, and there, away from her friends or any one to advise her, in the presence of a lawyer of his own choosing, he had it explained to her from his standpoint by his lawyer in his presence, and, after its execution he has the clerk come to this room in the hotel to take her acknowledgment. What had passed between her and Judge Tilton is not known, but one thing is certain, so far as the record shows, she was not advised in the slightest at or before the time of the execution of this contract, as to what property he owned, or what her property rights were, or what was the real effect of the execution of this paper. Considering the ages and past experience of the contracting parties, together with the short time since the death of Judge Tilton's first wife, we must conclude that their marriage was not bottomed upon sentimental grounds, and this is especially true when considered in the light of the contract before us, for we find in it no single expression of love, affection, or other kindred sentiment. On the contrary it contains propositions so cold in their terms as to be almost cruel. The gift of the mare and sewing machine cited therein need not be considered, for the reason that upon the consummation of their marriage these articles of personalty, under the then existing law, became at once the property of her husband. Nor need we consider those clauses of the contract which expressly provided that he would not be responsible for any debt which she might contract without his written consent, and that he would clothe and supply her with the necessaries of life after their marriage; for the one is but a limitation upon the privilege and freedom which his future wife might enjoy as to purchases for herself, and the other was a

Tilton v. Tilton.

recitation of the assumption by himself of a liability which the law imposed upon him. Had the import of either of these provisions in the contract been understood by his prospective wife, it must have been both embarrassing and humiliating to her. Of neither of these clauses, however, does she complain, but it is of that clause of the contract which provides that she shall have no part in her husband's estate (either that which he then possessed or might thereafter acquire), upon his death, although it expressly provides that any property she may possess at her death shall pass to her husband, if living, and if not living, to his heirs. In other words, under this contract, all of her estate passed to him or his heirs upon her death, whereas upon his death she is to receive no part of his estate whatever. It has been repeatedly held that a woman may release her rights in her intended husband's property, but such a contract must be free from fraud or misrepresentation or the practice of deceit on the part of the husband, must be reasonable in its provisions, and entered into with the best of good faith on the part of both. Such an agreement, when fairly made, should be upheld, but if there are circumstances which tend to show that the wife has been deceived or overreached, it should be set aside; and, where the contract shows upon its face that it is unjust or unfair, the burden has invariably been placed upon the husband or his representatives to show that it was fairly procured, and that the wife was not overreached or deceived in the execution thereof. The rule is thus most admirably stated in 21 Cyc. p. 1250: "Courts of equity will take into consideration the adequacy of the provision for the wife, since ante-nuptial agreements wherein the wife releases her rights in the husband's estate should be reasonable in their terms.

To determine the fairness and reasonableness of the agreement of all of the circumstances, such as the wealth of the husband, the existing means of the wife, the age of the parties, and the prospective wife's full and clear knowledge and understanding of the nature and meaning of the terms of the contract are properly regarded. Good faith is the cardinal principle in such contracts. If the provision made for the wife is unreasonably disproportionate to the means of the husband, the presumption of designed concealment is raised, and the burden of disproving the same is upon him."

This principle is in perfect accord with the reported decisions of our courts. In the case of Maze's Exor. v. Maze, 99 S. W. 336, 30 Ky. Law Rep. 679, the marriage contract, unfair to the wife in its terms, was set aside because of the failure of the representatives of the husband to show that it was understood by the wife at the time she signed it. In Brooks v. Brooks, 58 S. W. 450, 22 Ky. Law Rep. 555, the contract was set aside because the wife had been induced to sign it to pacify the opposition of her husband's children by a former marriage, and that it was executed for such a purpose. In Simpson v. Simpson's Exor., 94 Ky. 586, 23 S. W. 361, 15 Ky. Law Rep. 353, the antenuptial contract, which made some slight provisions for the wife, was set aside because, judging from the contract itself and the circumstances under which it had been executed, the wife was overreached. The principles announced in these three foregoing cases are in harmony and accord with the opinions of courts of last resort in other States, notably New York and Pennsylvania. The contract under consideration is very unreasonable, inequitable, and unfair in dealing with the wife. In fact, it is more unconscionable and

unjust to the wife than any marriage contract to which our attention has been called; and, being such, the law casts upon the representatives of Judge Tilton the burden of showing that at the time of its execution appellee understood the nature and extent of her prospective husband's estate, and the value of her marital rights therein, which she was, by its terms, surrendering.   Dr. Brown testifies that he did not know the nature and value of Judge Tilton's estate, although he considered him a man in good circumstances for a Robertson county farmer, yet he did not, according to his testimony, discuss this view of the contract or transaction with Mrs. Tilton.   But it is argued that it must be presumed that, having lived in that locality for some time before her marriage, and in his immediate family for more than a year before her marriage, she was bound to know, at least to some extent, the nature and value of the estate.   To this we answer that presumptions will not be indulged in order to establish a state of facts that would cast a wife, after more than 30 years' faithful service, penniless upon the world.   Neither does the doctor pretend to say that he explained to her what her marital rights were in the property of her prospective husband, and of which this contract was totally depriving her.   On the contrary, his whole aim seemed to be to explain to and satisfy her, to use his own language, "of the necessity for the peace offering in the neighborhood on account of the young people living there." When this contract is considered in the light of the circumstances under which it was executed, and the relation in which the parties were situated at the time, their station in life, education, and advantages, we are constrained to the belief that appellee did not understand its terms, but executed same under the mistaken

belief that it was a "peace offering," prepared for the express purpose of preventing trouble between herself and the children of Judge Tilton. Such a contract could only be sustained by evidence of the most positive character, to the effect that its terms were fully comprehended, understood, and acquiesced in. No testimony of such a character is introduced in this case.

Lastly it is urged in argument that, after the execution of the contract, appellee had more than two months within which to advise herself as to her rights before she entered into her marriage with the judge, and that therefore she must have been satisfied, else she would have made complaint. This argument is without force. The contract had been signed, and passed from her, and undoubtedly the same influence which induced her to sign it operated to lull her into silence and acquiescence, not only during the two succeeding months, but during the 32 years which followed. The question is not, was she satisfied? but, was she deceived? It was not until after her husband's death that she realized and understood how cruelly she had been imposed upon and deceived in the execution of this contract, and how helpless and poverty stricken it left her in her old age, after a life of service and devotion. Equity to the wife demands that this contract be canceled and held for naught, and appellee awarded that interest in the estate of her husband to which, under the law, she is entitled.

The judgment is reversed and cause remanded, with instruction to the trial court to enter judgment in conformity with this opinion.