## Gaines v. Gaines' Administrator, et al.

(Decided March 2, 1915.)

### Appeal from Boone Circuit Court.

1. Husband and Wife—Ante-nuptial Contract.—An ante-nuptial contract between persons contemplating marriage will be sustained if there was no fraud, deception, concealment or undue influence practiced in its procurement by the man, and it was freely and voluntarily entered into by the woman.

2. Husband and Wife—Ante-nuptial Contract—Validity of.—Ante-nuptial contracts are not unlawful engagements or against public policy, and the mere fact that the provision made for the wife is not as much as the law would give her in the absence of a contract, is not sufficient ground on which to set it aside.

3. Husband and Wife—Ante-nuptial Contract—Burden of Proof.— Ante-nuptial contracts are controlled by the same rules of law and stand on the same footing as other contracts, with the exception that the burden of proof is put on the party relying on the contract to show that it was fairly entered into, and the party assailing it, where it is inequitable and unjust, is not required to sustain the attack by the volume of proof necessary to overthrow ordinary written instruments.

4. Husband and Wife—Contracts Between—Parol Agreements.— Previous or contemporaneous agreements in respect to an ante-nuptial contract between persons intending to marry, should be treated as merged into a subsequent written contract between them.

5. Husband and Wife—Evidence.—In a suit by the widow to set aside an ante-nuptial contract, she cannot testify after his death concerning conversations with her intended husband in respect to the contract.

SNYDER & DICKERSON and A. B. ROUSE for appellant.

SIDNEY GAINES and CLORE, DICKERSON & CLAYTON for appellees.

OPINION OF THE COURT BY JUDGE CARROLL—Affirming.

This suit was brought by the appellant, Mrs. Nannie
E. Gaines, against the appellee, William A. Gaines, as
administrator, with the will annexed, of B. R. Gaines,
to set aside an ante-nuptial contract entered into be-
tween Mrs. Gaines and B. R. Gaines, so that she might
receive her dowable and distributable share of his estate
under the statute.

After the case had been prepared for trial it was sub-
mitted for hearing and a judgment rendered dismissing
the petition of Mrs. Gaines, and from this judgment she
prosecutes this appeal.

The grounds upon which she sought to set aside the
ante-nuptial contract were substantially the following,
taken from her petition: She averred that in 1894 B.
R. Gaines commenced paying her attention and con-
tinued to visit her until they became engaged to be
married. That during the time of their engagement he
asked her what part of his property she wanted in the
event of their marriage, and suggested that some con-
tract be entered into on their part providing for the
same. That she stated that all she asked and wished for
was to become his wife and be regarded and respected
as such, and that without such regard and respect she
would not marry him, and that, in the event of their
marriage, and she outlived him, whatever sum the law
allowed to the widow would be agreeable to her. That
Mr. Gaines told her that he had been married three times
and had had some trouble with his wives, and that if
she really cared for and trusted him and was not mar-
rying him for his money, she would not hesitate to enter
into some such contract. That, desiring to please her
intended husband, and relying upon his assurance that
the contract would be strictly confidential between them,
she entered into a written agreement with him on De-
cember 15, 1894, which provided that in the event of their
marriage taking place, if it proved to be a happy one,
the agreement was to be ignored and of no effect, but
that in the event the marriage proved to be an unhappy
one, and she did not live with him until his death, she
was to receive the sum of five thousand dollars. That
the contract was made for the purpose of and as a means
of protection to B. R. Gaines, and to show her confidence
in him, and was not intended to deprive her of her stat-

utory share in his property as his widow in the event she lived happily with him until his death.

She further averred that on the 22nd day of May, 1895, Mr. Gaines told her that the first contract was not written properly and that he had an attorney write one substantially the same as the one entered into in December. That this contract was then and there signed by both of them and witnessed by two friends, and it was understood that it was to be confidential between them; that it was signed by her without reading it or having the advice of friends, but with the understanding that it was to be treated exactly as the first contract and was to be effective only on the terms of the first contract.

She further averred that at the time of their marriage he had an estate worth more than a hundred thousand dollars, and at the time of his death it was worth one hundred and fifty thousand dollars, and that he did not explain to her, nor did she know, the value or extent of his property at the time of the marriage or when the contracts were signed.

She further averred that the contract was procured by misrepresentation and was unjust and inequitable and was intended and designed by B. R. Gaines to be a fraud upon her marital rights at the time he requested her to execute the same. She further averred that she had renounced within a year the provisions of his will, which made only a small devise for her benefit and asked that she have set apart to her such a share of his estate as the law allowed.

The answer of the administrator, after traversing so much of the petition as was deemed necessary, set up affirmatively facts supporting the validity of the contract assailed.

It appears from the evidence that in 1894 Mr. Gaines was about 73 years old and Mrs. Gaines 47 years old. He had been three times previously married and she was a maiden lady. He had lived near Petersburg, in Boone County, Ky., for a great many years, and probably all of his life previous to 1894, and was regarded generally as one of the wealthiest—if not the wealthiest—citizens of the county. He owned near Petersburg some 1,400 acres of land, and was actively engaged in business enterprises, and was one of the best known citizens of the county, and the fact that he was a man of

large wealth was known by every one, especially in the neighborhood of Petersburg.

Mrs. Gaines, in 1894, was postmistress at the little town of Petersburg, and was a well-educated, sensible woman, refined, cultured and respected. She had lived all of her life at Petersburg and had known Mr. Gaines for many years, but there had never been any particular intimacy or friendship between them previous to 1894.

He commenced paying her matrimonial attention in May, 1894, and these attentions, which were progressing at the time the first marriage contract between them was entered into in December, 1894, continued until their marriage in May, 1895. It also appears that the December contract was written and signed in duplicate and Mrs. Gaines kept the copy delivered to her for several years after their marriage. The substance of this contract, which was signed by both of them, although not witnessed by any person, was that she should have, at his death, $5,000 in full of and in place of any share or part of his estate that the law allows to widows, and that, if he outlived her, he should not have any part of her estate.

There is an unsigned paper in the record bearing the date May 8, 1895, that Mrs. Gaines identified as being a copy of this contract, and it sets it forth substantially as we have stated.

In May, 1895, the contract attacked in this suit by Mrs. Gaines was entered into between them. This contract, which is in the record, after setting forth the agreement to marry, provides, in substance, that Mrs. Gaines, if she survived Mr. Gaines, should have $5,000 in full settlement and satisfaction of all interest in his estate. It further provided that she should not administer on his estate and that he should have no interest in any estate she might have if he survived her.

It will thus be observed that the only material difference between the May contract and the one entered into in December, 1894, is that the May contract stipulated that she was not to administer on his estate, while the December contract did not contain any condition of this kind. The May contract was furthermore witnessed by A. B. Parker, a brother-in-law of Mrs. Gaines, who lived in Petersburg, and M. F. Wingate, also a citizen of that place.

The parties married the day following the execution of this May contract, and lived happily together as man and wife until the death of Mr. Gaines in 1910. During their marriage life he provided her with all the comforts and conveniences suitable to the station in life they occupied and the habits and economy of the community in which they lived, and she discharged all of her wifely duties in a becoming style and manner.

In the consideration of this case it is important to keep in mind the execution of the first contract between the parties, a copy of which Mrs. Gaines had. This first contract fully advised her of the portion of his estate she would receive in the event she survived him, and between the time it was written and the execution of the second contract she had ample time and opportunity to read the contract and advise with her friends and relatives who lived at Petersburg about it, as well as to ascertain, if she did not then know, the value of Mr. Gaines' estate and her property rights as wife and widow. So that it cannot be said that she entered into the contract in May, 1895, under the immediate influence of Mr. Gaines, or without time and opportunity to make up her own mind free from any dominion that he might exert over her. She had the fullest time to carefully consider whether she desired to marry him under the conditions set out in the contract. Under these circumstances it would be doing injustice to the intelligence of Mrs. Gaines and be a reflection on her womanly curiosity to say that in May, 1895, she did not know fairly well the value of his estate and the share the law would give her at his death in the absence of a contract. In the country, and in and about little towns like Petersburg, everybody knows who are the rich and the poor, especially the very rich and the very poor, and we are quite sure that Mrs. Gaines, in May, 1895, knew in a general way the value of Mr. Gaines' estate and the rights of a widow under the law. Indeed, in her evidence she says she did.

Under the circumstances surrounding the parties we think we have the right to assume that in May, 1895, Mrs. Gaines had all the information needed to advise her, not only as to the value of Mr. Gaines' estate, but of her rights as a wife and widow, and that she freely and voluntarily entered into the ante-nuptial contract.

Confronted by these conditions, that would seem to present conclusive reasons why the contract should not be set aside on the grounds usually resorted to for the purpose of annulling ante-nuptial contracts, the effort is here made to avoid this contract on the ground that Mrs. Gaines was induced to execute it in reliance upon his assurance that it was intended only to protect him in the event their marriage did not turn out happily, and, if they did live happily together and she survived him, the contract was not to be binding and she should have her legal share of his estate.

We do not find, however, in either of the contracts any basis for this belief on the part of Mrs. Gaines. There is no intimation or suggestion whatever in either of them that would lead any person to suppose that the contracts were not to be enforced as written or that in any contingency, or under any circumstances, she would receive at his death more than the contract specified. If there was an understanding or arrangement such as she relies on, it was not embraced in the contract and must have been based on conversations that took place between them before or at the time these contracts were executed.

But, if there was such an understanding, it cannot avail Mrs. Gaines for two reasons.

It is a well settled rule in the law of contract that the terms and conditions of a written contract cannot be varied or contradicted by previous or contemporaneous oral arrangements between the parties, in the absence of fraud or mistake in the execution of the writing. As said in Crawford & Gatlin v. M. Livingston & Co., 153 Ky., 58: "It is of the utmost importance in the transaction of business affairs that written contracts should be upheld, in the absence of strong and convincing evidence that they were procured by fraud or mistake." When parties to a contract "have talked the matter over, and each has had his say, and they put into a few words, in writing, the real contract they have entered into, it is reasonable to presume, and the law does so, that this writing speaks the intention of the parties to it and expresses their mutual understanding of what was agreed upon, and all that was said before is put aside. If the paper itself is plain in its statements, easily understandable, and bears on its face no evidence of the alleged fraud, it operates by law to merge all that was spoken before, leading up to its execution. All that

was said then, and which is not incorporated into the document, must be regarded as abandoned or modified by the terms finally written down and signed. Such is the very purpose of written instruments. It is to make certain that which may have been indefinite, or about which a dispute might arise, depending for its settlement upon fickle memories or interested testimony. As the paper speaks for itself, cannot be misunderstood, and forgets not, the law looks with marked favor upon written documents as evidence, placing them in the highest category."

And we know of no good reason why ante-nuptial written contracts should not be controlled by the same rules of law and stand on the same footing with other contracts, with the exception that the burden of proof is put on the party relying on the contract to show it was fairly entered into, and the party assailing it, where it is apparently inequitable and unjust, is not usually required to sustain the attack by the volume of proof necessary to overthrow ordinary written instruments. So that the terms of the written contract cannot be varied by evidence of the alleged parol contract or the parol contract be substituted for the written one, although evidence of such a parol contract would be competent for the purpose of showing fraud or mistake in the procurement of the written contract.

There is another reason, however, why the verbal arrangements relied on by Mrs. Gaines cannot be allowed to affect the terms of the written contract. Excepting her evidence on this subject, there is not a particle of evidence or a single circumstance in the record supporting her assertion that the contract was entered into by her with the understanding that it was not to be effective in the event they lived happily together and she survived him. Her statements come directly within the prohibition of Section 606 of the Civil Code, and so we must set aside as utterly incompetent her evidence as to conversations and agreement with Mr. Gaines prior to or simultaneously with the execution of the contract. This section of the code is peremptory and, subject to the exceptions pointed out in the section, no person can testify for himself concerning any verbal statements of, or any transaction with, or any act done or omitted to be done by a person who is dead when the testimony is offered to be given.

We will, therefore, treat the contemporaneous and previous verbal arrangements, if any were made, as merged in the written contract, and consider the case solely from the standpoint whether or not the contract was procured by fraud, concealment, deception or improper influence. That there was no mistake in its execution is conceded.

Looking at the matter from this viewpoint, there is no evidence in the record of any fraud, concealment or deception practiced by Mr. Gaines in the procurement of this contract, or of undue influence or controlling dominion on his part. Nor is there any evidence tending to show that it was not freely and voluntarily entered into by Mrs. Gaines. So, that unless the mere fact that the contract provides that Mrs. Gaines should have a great deal less than the law should give her in the absence of a contract constitutes grounds upon which to set it aside, there is no ground upon which this contract can be set aside. Indeed, we might here say that if this contract cannot be sustained, then no ante-nuptial contract can be, unless the provision made for the wife is substantially the same that she would get in the absence of a contract. Counsel for Mrs. Gaines argue that unless an ante-nuptial contract makes substantially the same provision for the wife that the statute does it should be set aside, but we do not think so.

We do not know of any principle of law or public policy that forbids the making of ante-nuptial contracts. They are regarded as perfectly legitimate and are uniformly sustained unless there is some evidence, direct or circumstantial, that their execution was procured by fraud, deception, concealment or dominion of such a character as to make it appear that an unfair and unjust advantage was taken of the wife. The mere fact that the contract gives the wife less than the law gives her is not, of itself, ground for annulling the contract, but when the contract limits the wife to much less than the law would give her if the contract had not been made, the court will carefully scrutinize all the circumstances surrounding its execution, and, unless it appears not to have been obtained by fraud, concealment, deception or undue influence, will annul it, and the burden of showing that its execution was free from fraud, deception, concealment or undue influence is upon the party relying on the contract.

As said in Tilton v. Tilton, 130 Ky., 281: "It has been repeatedly held that a woman may release her rights in her intended husband's property, but such a contract must be free from fraud or misrepresentation or the practice of deceit on the part of the husband, must be reasonable in its provisions, and entered into with the best of good faith on the part of both. Such an agreement, when fairly made, should be upheld, but if there are circumstances which tend to show that the wife has been deceived or overreached, it should be set aside; and, where the contract shows upon its face that it is unjust or unfair, the burden has invariably been placed upon the husband or his representatives to show that it was fairly procured, and that the wife was not overreached or deceived in the execution thereof. The rule is thus most admirably stated in 21 Cyc., page 1250: 'Courts of equity will take into consideration the adequacy of the provision for the wife, since ante-nuptial agreements wherein the wife releases her rights in the husband's estate should be reasonable in their terms. To determine the fairness and reasonableness of the agreement, all of the circumstances, such as the wealth of the husband, the existing means of the wife, the age of the parties, and the prospective wife's full and clear knowledge and understanding of the nature and meaning of the terms of the contract, are properly regarded. Good faith is the cardinal principle in such contracts. If the provision made for the wife is unreasonably disproportionate to the means of the husband, the presumption of designed concealment is raised, and the burden of disproving the same is upon him.' "

Putting, then, upon the administrator of Mr. Gaines the burden of showing that this contract was fairly procured and that Mrs. Gaines was not overreached or deceived in the execution thereof, we find no evidence whatever in the record tending to show that the contract was not fairly procured or that Mr. Gaines did not, throughout the whole transaction, act in the utmost good faith. The strongest evidence of his good faith, as well as the best evidence that Mrs. Gaines entered into the contract deliberately and with full knowledge of its meaning, is to be found in the fact that some time before the marriage, and at a time when it does not appear any one knew of their engagement, he fully advised her of the amount she would receive at his death, and she vol-

untarily, and after mature consideration, agreed to accept it. The age, position in life, and the circumstances surrounding these parties all tend to show that each of them was capable of protecting his interest. Mr. Gaines, by his own efforts, accumulated all the property he had when he married and by his own efforts added to his estate after his marriage. It was not, we may assume, a love affair between this couple in the ordinary meaning of these words, but was rather a marriage of convenience. Mrs. Gaines was doubtless glad to exchange the drudgery and confinement of keeping a small postoffice for the position of wife of the richest man in the community, and Mr. Gaines no doubt thought that, upon entering into a marriage relation at so late a period in his life, it would not be fair to his children unless some property arrangements were made such as would give to his wife a fair income, and yet not take from his wealth, in the creation of which she had no part, the large sum the law would give her in the absence of a contract.

Under these conditions they doubtless often talked the matter over, agreed on the terms of the contract, and finally entered into the marriage relation, but not until both parties fully understood their property rights.

The Tilton case, *supra*, is relied on by counsel for appellant, but the facts of that case are so radically different from those in this case that it should not have any controlling influence. In that case Tilton married his housekeeper, who was a poor, uneducated woman, completely under his dominion; and in the ante-nuptial contract he gave her only a sewing machine and a horse, which, under his influence, she agreed to accept in satisfaction of her lawful share of his estate.

In Simpson v. Simpson, 94 Ky., 586, also relied on by counsel for appellant, the marriage contract was entered into on Tuesday, with the understanding that the marriage should take place on the following Thursday, but, upon the insistence of the intended husband they were married early Wednesday morning in order that the wife might not have an opportunity to advise with her friends concerning a marriage contract that made only scanty provision for her welfare. The opinion recites that he was a shrewd business man and she an illiterate, uneducated woman. That "she was subordinated to his will, as the facts show, both before and after the marriage," and "it is a case of the exercise of an un-

limited and tyrannical control by the husband over the wife's action from the date of the marriage contract until his death.''

Another case is Brooks v. Brooks, 22 Ky. L. R., 555, in which the contract was set aside upon evidence showing that the sum stipulated in the contract was inserted only for the purpose of pacifying the children of the husband and not with any intention to exclude the wife from the statutory share in his estate.

In Maze v. Maze, 30 Ky. L. R., 679, the ante-nuptial contract made no provision whatever for the wife out of the husband's estate, and the court held that under the evidence the contract was a fraud upon the rights of the wife, and set it aside.

In Settles v. Settles, 130 Ky., 797, the marriage contract was upheld under a state of facts very similar to those appearing in this record. In that case, as in this, the wife knew, or had opportunity to know, what property her intended husband had, and, as said by the court, ''from her previous acquaintance with him and obvious knowledge of the purpose of his visits to her, it is improbable that she should have failed to acquire some information as to the quantity and value of his estate, for the means of her doing so were manifestly at hand. * * * The marriage must have been largely one of convenience, and such marriages are not usually effected without some consideration of property acquisition or other practical benefit. Whatever may have been appellant's motive for entering into the marriage, the evidence does not show that she was without means of learning all that she could have desired to know about the financial worth of the man she married. * * * It is a significant circumstance that no witness introduced by her testified to any act or declaration of the deceased husband that indicated any effort on his part to conceal from appellant's knowledge what property he had or its value; and there was no proof whatever of his making any representation that was untrue, or holding out any improper inducement to her to enter into the marriage contract. * * * In brief, there was nothing attending the intestate's courtship of appellant, or the circumstances surrounding the execution of the ante-nuptial contract, or the marriage, that indicated any concealment upon his part as to the nature or value of his estate, or any intention to mislead or deceive the

appellant. There was certainly no undue haste in the execution of the contract, and there was ample time afforded appellant to have objected to or withdraw from the contract between the date of its execution and her marriage with the intestate. There is an entire omission from the record of any evidence tending to show either concealment, deception, or fraud upon the part of the intestate in the procurement of the ante-nuptial contract. * * * We are not aware that this court has ever condemned an ante-nuptial contract made under such circumstances as attended the execution of this one. On the contrary, it has, in several instances, sustained such contracts made under similar circumstances, upon the ground that the intended marriage alone, in the absence of fraud, concealment, or duress, was a sufficient consideration to uphold it. Forwood v. Forwood, 86 Ky., 114; Crostwaight v. Hutchison, 2 Bibb., 408; Mitchell's Admr. v. Mitchell, 4 B. Mon., 380; Bishop on Married Women, Vol. 1, Sec. 775.''

The chancellor, in his judgment, said that there was no evidence to establish ''any fraud, deceit or concealment on the part of Ben R. Gaines, used or practiced by him to procure the plaintiff to execute the ante-nuptial contract sued on, and the court finds and adjudges that said ante-nuptial contract was fairly entered into.''

We think, however, that the finding should have been that the evidence affirmatively shows that no concealment, deception or fraud was practiced by Mr. Gaines, and that the contract was freely, fairly and voluntarily entered into by Mrs. Gaines with knowledge, not only of her property rights as a wife and widow, but of the value of the estate owned by Mr. Gaines.

Wherefore, the judgment is affirmed.