## Stephens v. Stephens, et al.

(Decided October 1, 1918.)

### Appeal from Kenton Circuit Court.

1. Husband and Wife—Ante-Nuptial Contract—Validity.—Ante-nuptial contracts are valid and are uniformly sustained unless there is evidence that they have been procured by fraud.

2. Husband and Wife—Ante-Nuptial Contracts—Burden of Proving Fair Procurement.—Where the amount which the wife receives under an ante-nuptial contract is wholly disproportionate to the amount she would have received under the law, the husband's representatives have the burden of showing that the contract was obtained fairly and without fraud, concealment, deception or undue influence.

3. Husband and Wife—Ante-Nuptial Contracts—Validity—Evidence.—In an action involving the validity of an ante-nuptial contract, evidence considered and held not to show that the contract was obtained from the wife by fraud or undue influence.

JOHN B. O'NEAL for appellant.

S. D. ROUSE, JOHN H. KLETTE and MYERS & HOWARD for appellees.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY, COMMISSIONER—Affirming.

This appeal involves the validity of an ante-nuptial contract between John F. Stephens and Sarah E. Stephens, formerly Sarah E. Martin, by the terms of which they agreed that neither was to have any interest in the estate of the other by reason of the contemplated marriage, unless Sarah should survive her husband, in which event she was to have the sum of $1,000.00, in lieu of her dower and distributable share of his estate. The question arises in the following way: Upon the death of John F. Stephens his widow, Sarah E. Stephens, brought this suit against his administrator and heirs to recover dower in his real estate and her distributable share of his personalty. The defendants pleaded the ante-nuptial agreement in bar of her right to recover.

She attacked the agreement on the ground that it was obtained by fraud and undue influence. On final hearing the chancellor adjudged the contract valid and dismissed her petition.

After a careful consideration of all the evidence in the case, the court concludes that the chancellor did not err in sustaining the contract, and since his opinion contains not only a fair statement of the facts, but a clear exposition of the principles of law applicable thereto, it is adopted as the opinion of the court. The opinion is as follows:

"Ante-nuptial contracts are perfectly legitimate, and are uniformly sustained unless there is evidence that they have been procured by fraud. The courts carefully scrutinize the circumstances of their execution and the burden is upon the husband or his representative to show that no unfair advantage has been taken of the wife. Where the amount which the wife would receive under the contract approximates what she would have received under the law, no suspicion ordinarily attaches to the transaction, but the contrary is true when a gross disproportion exists between the amounts receivable under the two states of case.

In this case, such a disproportion does exist, and a presumption of fraud arises, placing upon decedent's representatives the burden of showing that the contract was obtained fairly, and without fraud, concealment, deception or undue influence.

Plaintiff, at the time of her marriage, was a mature woman of between thirty (30) and forty (40) years; she had a common school education; was intelligent, and, though inexperienced in business, was as capable of attending to her affairs as the average woman in her station in life. For some years previous to her marriage she was employed as a nurse or domestic and earned a weekly wage of $2.50 and board. All her life she lived in the vicinity of her future husband's residence; for a considerable length of time she lived in the home of one of his sons, and for two or three weeks lived in the same house with decedent.

John F. Stephens was about eighty (80) years of age at the time of his marriage. For a man of his years he was unusually vigorous in mind and body. He was a very prominent if not a leading citizen in his community; was very highly regarded, and was reputed to

be wealthy, if not one of the wealthiest men in the country section of Kenton county. His actual wealth at the time of his death, and probably also at the time of his marriage to plaintiff, was from thirty thousand ($30,000.00) dollars to forty thousand ($40,000.00) dollars, but had been somewhat greater at an earlier date.

About three or four years after his marriage, decedent began to fail mentally and physically, and toward the end of his life required much care and attention. His wife, during the entire time, and particularly towards the end, gave him all attention he required and was in all respects a faithful wife.

Considering the age of the decedent, the great disparity in the ages of the contracting parties, their respective conditions in life and all of the other circumstances, the court does not think that affection was a motive in this marriage.

Mr. Stephens wanted someone to take care of him and possibly furnish him companionship. The plaintiff sought to better her condition, and the court thinks her expression to the witness, Armstrong, "that she would marry the old man if she thought it would better her condition," probably represented her true mental attitude, and it would likewise seem to indicate that she approached the matter of the contract in a calculating spirit, and with the idea of doing as well as possible for herself.

For several months prior to the marriage, decedent's attentions to plaintiff were noticeable, and about a month before the event plaintiff and decedent called upon the deputy county clerk at Independence, where, in the presence of plaintiff, decedent told that official of their intended marriage and of their intention of entering into a marriage contract, by the terms of which he was to give his wife the sum of one thousand ($1,000.00) dollars. Subsequently decedent had the contract drawn up by an attorney, and then again, accompanied by plaintiff, returned to the deputy county clerk, who took their acknowledgments, that of plaintiff being taken separate and apart from decedent. On the occasion of the first of the above visits to the deputy county clerk, Mr. Stephens remarked, in the course of the conversation about the contract: "I will give Sarah more than that," and to Mr. Northcutt, a nephew, on the day of his mar-

riage, he said: "The contract is for one thousand ($1,000.00) dollars, and if I live long enough I will make it bigger."

Several possible constructions of these two remarks by decedent have been suggested, but the court is inclined to think that the most satisfactory is that Mr. Stephens, realizing his great age and his very short expectancy of life, considered the one thousand ($1,000.00) dollars a sufficient sum to pay for the service to be rendered to him, but that if he lived longer than he expected he would increase the allowance proportionately.

That decedent sought to influence plaintiff to sign the agreement by making fraudulent representations as to future gifts or bequests is not consistent with his reputation for integrity, whereas the other construction comports perfectly not only with that reputation but also with his character as a careful, thrifty, intelligent man.

The record does not disclose that plaintiff did or did not receive anything in the way of gifts from her husband subsequent to her marriage, and there is nothing to show that decedent kept his promise to give her more than the one thousand ($1,000.00) dollars, but neither the failure of decedent to give his wife additional money nor his failure to keep a promise, if such there was, can in any way affect the validity of the contract, unless we believe plaintiff was induced to sign the agreement by promises fraudulently made for that purpose, and, as indicated, the court does not think decedent had any such purpose.

The testimony of Jeff Stephens, one of decedent's sons, and John J. Martin, plaintiff's father, it is insisted strongly, supports plaintiff's contention that she was deceived and misled into executing the contract. With reference to the father's testimony it is urged that in as much as he was the natural adviser of plaintiff, decedent should have informed him of the terms of the contract, or at least that it would have been natural and proper that decedent would have discussed the matter with him. And it is urged that because decedent said nothing to Mr. Martin, that a purpose of concealment from plaintiff's natural adviser is indicated. Mr. Martin was a very old man, not very intelligent, and hardly capable of giving plaintiff advice upon business or other matters. If he could be considered the natural adviser of plaintiff, she at least, did not so regard him, for at no

time did she counsel with him, and never, at any time, asked his advice about or even mentioned the contract with decedent. The court is of the opinion that plaintiff was better able to form a judgment as to the advisability of the contract than was her father. This witness testified that decedent said to him: "I intend to provide well for her and set aside an independent living," and also "I said to Sarah I wouldn't object to her marrying again, but to be careful who she would marry or she would get somebody that would drink up or gamble or squander what I give her." It is argued that if this was said to the father, it must also have been said to the daughter. Conceding this inference to be correct it does not follow that it constituted a fraudulent or any inducement to plaintiff in the execution of the contract. What has been said with reference to the statement to Loomis and Northcutt is applicable in this connection.

Mr. Stephens may have intended, in the event of a happy outcome of his marriage, to increase the portion of his estate to be set aside for his wife, but such an intention is not inconsistent with the execution of the marriage contract. It might also be suggested in this connection that such expressions as are here referred to, considered in connection with the statements to Northcutt and Loomis, tend to rebut the charge made by plaintiff that decedent endeavored to, and did in fact, conceal from her that he was a man of means. It is inconceivable that plaintiff did not know what was apparently known by the entire community in which she lived, and the expressions to which reference has just been made indicate that Mr. Stephens was not trying to appear in the light of a poor man, or one who was not able to make more ample provision for his wife.

Thus far in our consideration of the case, we have not been able to find much, if any, support for plaintiff's contention. The only other proof of any importance, and it is upon this that plaintiff chiefly relies, is the testimony of Jefferson Stephens, one of decedent's sons, who avowedly favors plaintiff's side of this controversy, although his interests are obviously otherwise. This witness says that within a month of the marriage his father said to him that he was going to leave Sarah enough to do her as long as she lived, but he had storied to her and told her he didn't have much money; that some-

times young women want to spend too much. The contract was not at that time mentioned, but about a month later decedent said to the witness he was going to do away with the contract; that it was only got up for a short time, and would not have been drawn up at all but for the advice of a friend, who thought that the children might in that way be quieted down. Giving this testimony a construction most favorable to plaintiff, i. e., that it means that decedent deliberately lied to plaintiff as to the extent and value of his estate for the purpose of inducing her to sign the contract, should the court permit this evidence to outweigh all of the balance of the proof which, in the opinion of the court, shows that plaintiff could not have been misled into the belief that decedent was not, at least, comparatively, a rich man. If decedent had told plaintiff that he was poor, or that he had little or nothing left, she would not and could not have believed him; neither, the court thinks, would anyone else in the community. But, according to the witness, decedent did not "story" to plaintiff to induce her to sign the contract, but because she might spend too much money. In other words, if plaintiff knew he was rich she might prove an extravagant wife.

But why was the contract executed at all if decedent intended to leave his wife enough to do her as long as she lived? At the time this statement is alleged to have been made, scarcely a month had elapsed since the contract was signed. After all the preparation, the visits to his lawyer; the conference with the county clerk; every step showing deliberation and care, why the sudden determination to abandon the contract? Why was it ever drawn up? Counsel for plaintiff says that this is explained by the later conversation which this witness says he had with decedent when the latter said he was going to do away with the contract, because he had it drawn up to satisfy his children, and it had not accomplished that purpose. One difficulty with this explanation is that the witness had just said that decedent had told him that he had lied to his wife about his property and in that way induced her to sign the contract because young women want to spend too much money.

Another difficulty with counsel's explanation is that, aside from the fact that none of the children were present at the wedding, the proof does not show that there was

any ill feeling between the father and children, which fact, if true, could have been readily proven, but, to the contrary, the evidence shows that subsequent to the marriage the children visited their father and were apparently on friendly terms. But if decedent's purpose in securing the contract was to satisfy his children it was not one in any way unworthy, nor did it in any way affect the validity of the contract. Contracts of this kind are usually made for some such purpose. So long as fraud or undue influence are not used upon the wife, the contract is valid and binding.

The court thinks that the Court of Appeals summary of evidence in the case of Gaines v. Gaines, 163 Ky. 260, is peculiarly applicable to this case:

"The age, position in life, and the circumstances surrounding these parties all tend to show that each of them was capable of protecting their respective interests. It was not, we may assume, a love affair between this couple, in the ordinary meaning of those words, but was rather a marriage of convenience. Mrs. Gaines was doubtless glad to exchange the drudgery and confinement of keeping a small post office for the position of wife of the richest man in the community, and Mr. Gaines, no doubt, thought that upon entering into a marriage relation at so late a period in his life, it would not be fair to his children unless some property arrangements were made, such as would give to his wife a fair income and yet not take from his wealth, in the creation of which she had no part, the large sum the law would give her in the absence of a contract."

### ORDER.

It is adjudged that the ante-nuptial contract referred to in the pleadings and proof as having been entered into between plaintiff and John F. Stephens on or about the 6th day of July, 1907, was and is a valid, binding and subsisting contract."

Judgment affirmed.