## Harlin v. Harlin et al.

(Decided Nov. 22, 1935.)

RICHARDSON & REDFORD, FRANKLIN S. FITCH and LEO CIACIO for appellant.

CECIL C. WILSON and BAIRD & GARNETT for appellees.

OPINION OF THE COURT BY JUDGE STITES—Affirming.

This is an appeal from a judgment of the Barren circuit court, sitting in equity, in a suit filed to settle the estate of Sam C. Harlin, deceased. Mr. Harlin was married three times. He had eight children by his first wife, but none by his second wife. In February, 1931, when he was eighty-seven years of age, he married appellant, Eugenia Harlin. She was his third wife, and prior to her marriage to Mr. Harlin she also had been married twice. Her first husband died, and she divorced her second husband. At the time of her marriage to Mr. Harlin she was fifty-four years of age. It was shown in evidence that decedent desired to leave the greater portion of his estate to his children and grandchildren, and he discussed the question of an antenuptial contract with his prospective wife several times within a period of three or four months prior to the wedding, but, according to her testimony, no definite figures were discussed, and she was not advised at that time as to the value of his estate. It was determined some little time before the wedding, however, that an antenuptial contract would be entered into, and that, as the parties were going to Bowling Green to be married, they would make one trip do and execute the agreement and be married on the same trip. The parties went to the office of an attorney in Bowling Green, where they explained to him what was wanted, and the agreement was dictated by the attorney and signed and acknowledged by them. Within half an hour thereafter, Mr. and Mrs. Harlin were married. The contract recites the circumstances under which it was executed; that the wife was the owner of a house and lot at Glasgow Junction worth about $3,000, and of certain securities valued at approximately $1,200; and that the husband was the owner of approximately $30,000 worth of personal property. It then provides that the parties would occupy the house at Glasgow Junction, the wife keeping up the insurance and repairs, and the husband

paying the taxes and all of the necessary family expenses. It was then provided that if the husband should die before the wife, she should be paid the sum of $1,200 in satisfaction of her rights of dower and homestead and her distributable share in any personalty and that if she remarried, she should refund the sum of $1,200 to her husband's estate. In the event of the death of the wife before that of the husband, it was provided that he should receive such property from her estate as he would be entitled to as a surviving husband. Mr. and Mrs. Harlin made their home in Glasgow Junction, as provided in the contract, from the date of their contract and marriage until the date of the death of Mr. Harlin, two years later.

This action was filed for the purpose of settling the estate of Mr. Harlin and also of determining the validity of the antenuptial contract. Mrs. Harlin has prosecuted this appeal from the judgment of the chancellor sustaining the contract.

Antenuptial contracts have been a fruitful source of litigation in the past, and the rules of law applicable thereto are well settled. In Stephens v. Stephens, 181 Ky. 480, 205 S. W. 573, 574, the court said:

"Antenuptial contracts are perfectly legitimate, and are uniformly sustained, unless there is evidence that they have been procured by fraud. The courts carefully scrutinize the circumstances of the execution, and the burden is upon the husband or his representative to show that no unfair advantage has been taken of the wife. Where the amount which the wife would receive under the contract approximates what she would have received under the law, no suspicion ordinarily attaches to the transaction; but the contrary is true when a gross disproportion exists between the amounts receivable under the two states of case.

"In this case, such a disproportion does exist and a presumption of fraud arises, placing upon decedent's representatives the burden of showing that the contract was obtained fairly, and without fraud, concealment, deception, or undue influence."

The difficulty, of course, in these cases lies in the application of the established rules to individual situations. Potter's Ex'r v. Potter, 234 Ky. 769, 29 S. W.

(2d) 15; Gaines v. Gaines' Adm'r, 163 Ky. 260, 173 S. W. 774; Settles v. Settles, 130 Ky. 797, 114 S. W. 303; Tilton v. Tilton, 130 Ky. 281, 113 S. W. 134, 132 Am. St. Rep. 359; Maze's Ex'rs v. Maze, 99 S. W. 336, 30 Ky. Law Rep. 679. It is claimed by appellant that the provisions made for her are so wholly disproportionate to the means of her husband that a presumption of designed concealment is raised and that the burden of disproving fraud is on the personal representatives of the husband. While we fully recognize the rule and concede its application to the contract here under examination, it is apparent that the burden has been fully met in this case. The mere fact of the prima facie inequity of the contract does not of itself establish fraud. The presumption merely requires, because of the peculiar nature of the contract, that an explanation be offered to show that it was obtained fairly. The very purpose of an antenuptial contract, in the vast majority of cases, is to make some adjustment of the property rights of the parties different from that provided by law. Disparity between the allowance to the wife and the means of the husband is not itself fraud. At most, it is merely evidence of fraud, and where, as here, the position of the parties was such as fully to explain the situation, even the apparent disparity between what appellant should have received and did receive disappears.

At the age of eighty-seven it is clear that the decedent could have had little hope of augmenting his estate to any material extent before his death. His expectancy was negligible. The property to be distributed at his death necessarily must consist of the estate which he had already acquired, earned without the aid or counsel of appellant. He must have felt that the claims of his children on his estate were weightier than was the claim of appellant. When the age and condition of the parties are considered, it is difficult to escape the conclusion that the marriage was one of convenience, although doubtless actuated by a spirit of mutual respect and affection. According to the laws of nature, it was practically certain that Mr. Harlin would die first and that the only benefit he could reasonably anticipate from the agreement lay in the assurance that the major portion of his estate would go to his heirs. He evidently believed that the $1,200 given to his widow was a fair return for the remote expectancy that he might

receive curtesy in $1,200 and the home, should appellant predecease him.

The contract itself recites the value of the husband's property, and while appellant denies that she knew the exact value of the decedent's estate prior to the time that this recital was put into the contract, she admits that she knew that the decedent was well off. It is not claimed that the amount stated in the contract was not a fair valuation of the decedent's estate at that time. It approximated the value of his estate at his death. Appellant contends that she was ignorant of her marital rights. It was shown, however, that within two years of the date when this agreement was made, appellant entered into an agreement settling her property rights with a former husband. It is hardly possible that she could have entered into such an agreement without acquiring some information as to the extent of her rights. Aside from this, appellant herself testified that she thought the agreement was unfair at the time that she executed it, but that she thought she could persuade Mr. Harlin to change it, and that she had importuned him on numerous occasions to do so, beginning the night after the wedding. Clearly, accepting her own testimony, she was not deceived. If there was any deception, it lay in appellant's failure to disclose that she entered into the contract with reservations. Under the circumstances presented here, Mr. Harlin was entitled to be informed as to his prospective wife's views of the agreement before the marriage no less than she was entitled to information in regard to his estate and her prospective rights therein. Appellant, according to her own testimony and that of the attorney who prepared the contract, raised no objection to its terms and requested no information, even though she now says that she felt at the time that the agreement was unfair. It certainly is not appropriate now to say that the contract is unenforceable because of the very alleged unfairness that appellant realized before the marriage. Mr. Harlin, himself, might not have cared to go on with the marriage under a different contract. The age of the parties, their previous matrimonial experience, and the circumstances surrounding them, all tend to show that each was capable of protecting his or her respective rights and that no deceit was practiced on appellant. She simply chose to take her

chances on securing a change in the contract, and was not successful.

Finally, it is contended that the antenuptial agreement was abandoned by the failure of the husband to pay various household expenses, including the taxes on appellant's home, during the last year of his life. It was shown that Mr. Harlin paid the taxes for one year, but that he was taken ill and died in March of the following year, without having paid the taxes then due against the property. If appellant paid these taxes, she is entitled under the contract to remuneration from the estate, but the failure to make the payment was certainly not an abandonment of the antenuptial agreement under the circumstances. The substance of the competent proof in regard to the payment of household expenses shows little more than that the decedent disliked intensely to part with any money and objected to various expenditures made by appellant. It was not shown that he did not pay all household expenses which he himself considered properly within the terms of the contract as fixed by appellant's station in life. To show a voluntary abandonment of the contract on his part, it would be necessary to establish that he had failed to carry out some of its terms with actual or constructive knowledge of their proper interpretation. This was not done.

We think that the conclusion of the chancellor, sustaining the contract, was plainly correct. We would be obligated to sustain it if it were doubtful.

Judgment affirmed.