ELLEN BLAIR WILLIAMSON *v.* FIRST NATIONAL BANK
OF WILLIAMSON *et al.*

(No. 7016)

Submitted November 3, 1931. Decided December 8, 1931.

*S. D. Stokes, James Damron* and *John F. Hager,* for
appellants.

*Randolph Bias, Lafe B. Chafin, Lant R. Slaven* and *Wells.
Goodykoontz,* for appellee.

HATCHER, JUDGE:

The court is divided on this case. I am not of the majority,
but as the preparation of the opinion was originally assigned
to me, will attempt to state the views of the majority and later
dissent.

Wallace J. Williamson and Ellen Blair were married in 1917. Prior to the marriage they executed a contract, adjusting their marital property rights. He died in 1929, testate. The will limited his wife to the amount specified in the antenuptial contract, except as to some household goods, live stock, autmobiles, etc. She renounced the will, and demanded of his estate in this suit the portion allotted her as wife by law. The defendants relied on the antenuptial contract. The circuit court found in her favor and cancelled the contract. The defendants appealed.

The majority of the court refuses to accept any of the testimony of plaintiff in her own behalf; consequently in preparing a general statement of the evidence, I have omitted any fact which depends on her evidence alone.

About 1884, Mr. Williamson, then 39 years of age, a handsome widower with four children, and a resident of Catlettsburg, Kentucky, came to what is now Mingo County, West Virginia, and engaged in the timbering business. There he met Ellen Blair, then about fifteen years old, illiterate but very beautiful. He fell in love with her, and she gave him her heart. He courted her ardently, openly and aggressively, presented her to his brother's family as his intended wife, and started her in school. Either through lack of application or of interest, Ellen made no educational advancement. In 1885, while on a trip to Catlettsburg, he married a Miss Clinefelter. He later explained to his cousin, Jane Evans, that the reason he did not marry Ellen (in 1885), was because she was uneducated. Within two months after his second marriage, he commenced sending letters to Ellen, confiding to his messenger, Elijah Ferrell, that since his first wife died he had loved no woman but Ellen. Shortly afterwards he virtually abandoned his wife and established Ellen in a home at Naugatuck on his timber operation, where he spent most of his time and where she served and ministered unto him with intelligence, loyalty and devotion almost continuously for the following thirty years—a wife in everything but name. She described her life at Naugatuck in these laconic sentences: ''I stayed at home and made garden and raised chickens, and tended to the cows and cooked and

washed and ironed. * * * I done all that was to be done and what he (Mr. Williamson) told me to do and what I thought would satisfy him. * * * I worked to his advantage. * * * I tended to him day and night (during illness) and done everything a woman could do.'' Disinterested witnesses confirmed this description and testified without contradiction to acts and conduct by her, which materially promoted his logging business. She said of him he was ''as kind as he could be'' and gave her no occasion to doubt his love. The record discloses no stain upon her life except the scarlet letter she wore because of him. He was a shrewd business man, but his education was limited. Dr. Tunis Nunemaker, a witness for defendants, was their physician at Naugatuck, and was intimately acquainted with them for years. He testified that they were congenial and were interested in and devoted to each other.

In 1912, Mr. Williamson's second wife died, without issue. In January, 1915, he conveyed to plaintiff a tract of 103 acres at Naugatuck in satisfaction of all claims she had against him, whether for services rendered or to be rendered ''or on account of any agreement, promise, default or undertaking whatsoever made by him,'' except a note of $3,500.00 he owed her for borrowed money. If this settlement indicated a breach, it was soon healed by his solicitude for her during an attack of appendicitis. He took her to a hospital in Columbus on June 5, 1915, for an operation and remained with her until she was discharged on July 4th. Shortly after their return to Naugatuck he failed in health and was taken to Denver, Colorado. Sometime after returning from Denver he began arrangements to marry her. He requested William Dameron, deputy county clerk, who issued the marriage license to keep the matter a secret, saying his sons were ''raising Cain about him wanting to get married to Ellen, but he thought he owed it to her.'' The marriage was performed on January 3, 1917. On January 2nd, he had her sign the contract in question, agreeing that in consideration of $1,000 cash and $20,000 to be paid her upon or before his death, she would relinquish all the claims against his estate to which she would be entitled as his wife. He was a kind

and "a very devoted husband" said the Honorable M. Z. White, a witness for defendants. Miss French, a trained nurse who attended Mr. Williamson continuously during the last twelve years of his life, testified as a witness for defendants that Mr. Williamson and plaintiff seemed "to be perfectly contented with their marriage lot," and that he was very solicitious about her welfare. His estate is valued at about one and a half million dollars.

The plaintiff testified that she could not write her name and did not sign the 1917 contract; that she had no memory of such paper being read to her; that if it was read to her, she did not understand its terms (they were phrased in technical language); that she did not remember ever seeing or hearing of the contract until after her husband's death; and that at the date of the alleged contract she did not know the extent or the value of Mr. Williamson's property.

The record shows that plaintiff has remained practically as illiterate as when Mr. Williamson abandoned her education in 1885. She can read only with great difficulty and if she could sign her name in 1917 it was done mechanically. It is proved, however, by witnesses of integrity that she went through the motions of signing the contract, and that "a brief statement as to the main terms of the contract" was made to her at the time. It is also proved that in after years she recalled its provisions in a general way.

Equity ordinarily does not permit a man to drive a hard bargain with his prospective wife, without full disclosure of all the material facts. The law is clearly stated in Madden on Domestic Relations (the latest work thereon), section 73, as follows: "Persons about to marry are considered as occupying a relation of special trust and confidence toward one another. The usual consequence of confidential relationship follows, that the burden is upon the party, here the husband or his heirs, who profited by the contract, to show that it was entered into only upon a full disclosure of all the material facts. The most material fact, of course, is the extent of the property of the husband in which the wife gave up her rights. The burden is not upon the wife to inquire into this fact and the fact that she did not take advantage of her opportunities

to obtain information about it does not prevent her from assailing the settlement. The husband must have disclosed it, unless the wife actually knew it from other sources. * * * If the provision secured for the intended wife is disproportionate to the means of the intended husband, it raises a presumption of fraud or concealment, throwing upon those claiming in the husband's right the burden of disproving the same.''

These principles are so deeply imbedded in American jurisprudence that extensive citation of authority seems unnecessary. See *Hinkle* v. *Hinkle*, 34 W. Va. 142, 152-3, 11 S. E. 993; *Dehart* v. *Dehart*, 109 W. Va. 370, 372, 154 S. E. 870, 871; *Cole* v. *Blankenship*, 30 F. (2d) 211, 9 R. C. L., subject Dower, sec. 40; 19 C. J., subject Dower, sec. 149, 151; Schouler on Domestic Relations (6th Ed.), sec. 513.

The majority of the court does not question the above statement of the law but excepts this contract therefrom on the following grounds: (1) that while executed on January 2, 1917, the antenuptial contract was entered into verbally at a conference held about October 1, 1916; (2) that no engagement to marry is shown to have existed prior to that conference; and (3) that without such an engagement the parties dealt at arm's length at the conference, and Mr. Williamson was under no obligation then to make any disclosures to her. This position is based on the following evidence: About October 1, 1916, Mr. Williamson had two of his closest personal friends, Dr. Nunemaker and Alexander Bishop, attend a conference between him and plaintiff, explaining that they wanted to change their mode of living and agree either to separate or to be married. Mr. Williamson and plaintiff conferred privately (for the most part) and then reported, according to Dr. Nunemaker ''that they had agreed to fix this matter up between themselves.'' Mr. Bishop testified that plaintiff further said, ''I am not to have or interfere with any of his property and he is not going to interfere with any of mine, we will both control our properties separately.'' The majority relies on *Martin* v. *Collison*, 266 Ill. 172, 178-9, 107 N. E. 257-260, (and related cases) which held:

"The contract recites that the parties 'are about to enter into a contract of marriage.' So far as appears from that document, no marriage agreement had been entered into before it was signed, and for aught that appears from that instrument its execution was a preliminary step to the engagement to marry. Whatever may be the usual custom as to the time antenuptial agreements are made, it is not universally true that they are made after betrothal. It may well be, and undoubtedly is true, that a man and woman may contemplate marriage but one or both of them have reasons why it is desirable, not only before entering into the marriage relation but before there is any agreement to marry, to settle the rights of each in the estate and property of the other by an antenuptial agreement, and this step precedes and is preliminary to the contract or marriage. In cases of that character there will be no confidential relation existing until after the contemplated contract is made, and the law governing the rights of the parties under such contracts would be the same as is applicable to contracts entered into by persons between whom there exists no confidential or fiduciary relation."

The majority therefore reverses the decree of the circuit court and dismisses the plaintiff's bill.

*Reversed; bill dismissed.*

HATCHER, JUDGE, (dissenting) :

1. An agreement made upon consideration of marriage, when the marriage is "the end to be obtained or purpose to be accomplished" and not a mere incident to the agreement (27 C. J., p. 127, sec. 5), is invalid under section 5 of the Statute of Frauds, unless in writing. See *Lloyd* v. *Fulton*, 91 U. S. 479, 23 L. Ed. 363; annotation 10 A. L. R. 322. The oral agreement reached at the October, 1916, conference between the plaintiff and Mr. Williamson, according to the majority of the court, was such an agreement. Therefore, in order to reach its conclusion the majority has now treated as *valid* an agreement which the law has refused to recognize since the year of 1676. This treatment

might be justifiable if all the covenants of the written contract of January 2, 1917, were included in the October agreement. No witness even intimates that they were. The only property arrangement shown to have been reached at the October conference, was that Mr. Williamson would control his property and plaintiff would control hers. Not one word is reported from them about the disposal of the property when the control of either should cease (i. e. at death), or about the relinquishment of dower. Her mere assent that Mr. Williamson should control his property does not even imply such a relinquishment. See generally *Hinkle* v. *Hinkle, supra.* As far as the record shows, the question of dower rights was mentioned in her presence for the first time on January 2, 1917. The most the record warrants the majority in saying of the October conference, is what Alexander Bishop (a witness for defendants) who was present, said of it: "I think there is where your marriage contract started." Shortly after the October conference, Mr. Williamson had S. D. Stokes, an attorney of the city of Williamson, prepare an antenuptial contract between himself and plaintiff. Two weeks before the marriage, John F. Hager, an attorney of Catlettsburg, Kentucky, and chief legal advisor of Mr. Williamson, was called in consultation by him, relative to the contract. Hager did not approve the Stokes draft and on December 23, 1916, completed the one which was executed. The trial chancellor well said, the preparation of the contract would have been "a vain act" if the parties had not theretofore agreed to marry. The Hager draft itself (prepared ten days before it was executed) contains the recital, "Whereas, a marriage is intended to be shortly hereafter solemnized between the said Ellen Blair and Wallace J. Williamson." Besides, Alexander Bishop (defendants' witness) testified that he was told of the intended marriage by Mr. Williamson two weeks before it took place. Therefore, even if the parties had not agreed to marry at the "start" of the marriage contract in October, 1916, they had agreed to marry before its completion in January, 1917. I see no reason to exempt this *completed contract* from the restrictions surrounding the usual contracts between bethrothed couples.

Plaintiff's position, however, does not depend upon proof of an engagement to marry prior to the execution of the contract. A confidential relation may exist between a man and a woman under other circumstances than a betrothal. Beach, The Modern Law of Contracts, sec. 825, says flatly that the law recognizes such a relation in "all cases in which confidence is reposed by one party in another." This declaration was originally made by Sir Samuel Romilly, one of counsel in *Huguenin* v. *Basely,* a leading English case decided in 1807, and reported in 14 Ves. Jr. 273 (285-6) and in 1 White & Tudor Leading Cases in Equity (8th Ed.), 259 (265). Thirty years later, Lord Chancellor Cottenham recalled (with pleasure) the Romilly declaration and pronounced it the law, in *Dent* v. *Bennett,* 4 My. & Cr. 269, 277, 41 English Reports 105, 108. It was elaborated in 1852 by the Vice-Chancellor, Sir George J. Turner, in *Billage* v. *Southee,* 9 Hare 534, 539, as follows: "No part of the jurisdiction of the Court is more useful than that which it exercises in watching and controlling transactions between persons standing in a relation of confidence to each other; and in my opinion this part of the jurisdiction of the Court cannot be too freely applied, either as to the persons between whom, or the circumstances in which, it is applied. The jurisdiction is founded on the principle of correcting abuses of confidence, and I shall have no hesitation in saying it ought to be applied, whatever may be the nature of the confidence reposed or the relation of the parties between whom it has subsisted. I take the principle to be one of universal application, and the cases in which the jurisdiction has been exercised—those of trustees and *cestui que trust,* guardian and ward, attorney and client, surgeon and patient—to be merely instances of the application of the principle." This conception of the extent of the principle has been accepted since then without question (so far as I am advised) both in England and the United States. See 1 Story Eq. Juris (14th Ed.), sec. 370; 2 Pom. Eq. Juris .(4th Ed.), secs. 956 and 963; 1 Beach Modern Eq. Juris., sec. 125; Adam's Eq. (2nd Am. Ed.), 184; Lawson on Contracts (2nd Ed.), sec. 274; Kerr on Fraud and Mistake (6th Ed.), ch. 111; 26 C. J., p. 1158, sec. 72; 12 R. C. L., p. 232, sec. 5.

*Martin* v. *Collison,* (relied on by the majority) is materially different from the instant case in that the relations of the parties in that case had been merely casual prior to their agreement. The same situation existed in the related case of *In re Malchow's Est.* (Minn.), 172 N. W. 915, 917, cited in the brief of the defendants. Note the findings of the court there: "The parties were comparative strangers when they married. * * * Apparently there was an entire absence of professions of affection on either side. * * * He was not her superior in intelligence or worldly experience. The element of control over her actions was not present, and there was an absence of long association resulting in the repose of her entire confidence in him." The court naturally upheld the contract under those circumstances, but took pains to state the very principles which I contend for here, as follows: "The outcome of actions of this character depends on the presence or absence of influence acquired and abused or confidence reposed and betrayed. If those elements are present, there can be no valid contract between two persons except after a full and fair communication and explanation of every material particular within the knowledge of the one who seeks to uphold it against the objections of the one who trusted him." Here, despite Mr. Williamson's broken promise to plaintiff in 1885, the record shows (a) that he loved her devotedly and thereafter gave her no cause to doubt his love, and (b) that her confidence in him was quickly restored after his one defection, and continued unchanged (except perhaps in a few moments of dejection) until his death. The union between them was so strong that Dr. Nunemaker (defendants' witness) said of them to Mr. Bishop at or about the October conference, if people "expected them to separate their relationship entirely, they were fooling themselves." In *Leighton* v. *Orr,* 44 Iowa 679, 689, the court presumed that confidential relations "must have existed" between a man and a woman who had lived together unlawfully for years. The woman in that case was notoriously immoral and her influence over the man was acquired solely (according to the opinion) "by ministering to his passions." In *Dean* v. *Negley,* 41 Penn. 312, 318, the court said: "There can be no

doubt that a long-continued relation of adulterous intercourse is a relation of great mutual influence of each over the mind and person and property of the other. History abounds with proofs of it, and it requires no very long life, or very close observation of persons around us, in order to reveal the fact." A like case is *Shipman* v. *Furniss,* 69 Ala. 555, in which many authorities are cited. If confidence was presumed *as a matter of law* to have existed in those cases, *a fortiori* must we say it existed between Mr. Williamson and plaintiff whose continued association (though illicit) was one of mutual devotion. I concur fully with the trial chancellor who held that this association "created a relationship casting upon the decedent duties with respect to any antenuptial contract they might enter into equivalent to those which equity requires when the parties are engaged to each other." There is no difference in equity in the effect of the confidence engendered by this long association, and that by a betrothal. No matter how confidence arises, it must not be used to gain an advantage over the one confiding. "Wherever two persons stand in such a relation that, while it continues, confidence is necessarily reposed by one, and the influence which naturally grows out of that confidence is possessed by the other, and this confidence is abused, or the influence is exerted to obtain an advantage at the expense of the confiding party, the person so availing himself of his position will not be permitted to retain the advantage, although the transaction could not have been impeached if no such confidential relation had existed." Pomeroy, *supra,* sec. 956. A mere comparison of the sum provided in the contract ($21,000) with the value of plaintiff's expectancy as Mr. Williamson's wife (at least $400,000, as will be shown later) demonstrates that he obtained a tremendous advantage for his estate by means of the contract.

2. The circuit court found that the domicile of Mr. Williamson at the time of his death was in Kentucky. Upon his marriage in 1917 he moved to a home in South Williamson, Kentucky, where he resided until his death, except during time spent in Florida where he also had a home. The defendants proved that for many years prior to his last mar-

riage he resided and voted in West Virginia; that after moving to South Williamson (Kentucky) he with the plaintiff continued to vote in the city of Williamson (West Virginia); and that his business office remained there. Mr. Pinson (Plaintiff's witness) testified that Mr. Williamson claimed West Virginia as his home while residing in South Wllamson. Hon. M. Z. White testified that the city of Williamson was promoted by and named for Wallace J. Williamson; that he took great pride and interest in the upbuilding of the city, giving liberally for all public purposes, and that the witness was told by Mr. Williamson that he had gone to South Williamson merely for the purpose of developing it, and that he expected to build himself a home as well as a vault to be buried in on Reservation Hill in the city of Williamson. His will, written in Florida in 1922, opens with this statement: "I, Wallace J. Williamson of Williamson, Mingo County, West Virginia." The finding of the circuit court was largely due to the residence in South Williamson, and a clause in the will which gives to plaintiff the motor vehicles, etc., which might be on the premises of the home at South Williamson "or (the will proceeds) other premises occupied as our permanent home at the time of my death." The circuit court construed this clause as calling South Williamsonson his permanent home; but it seems to me that the "other premises" is the one designated as the permanent home, rather than South Williamson. This construction is consistent with his intention expressed to Mr. White and with the explicit declaration opening the will—that he was "of Williamson, Mingo County, West Virginia." It is clear to me that Mr. Williamson considered his residence in Kentucky as temporary and regarded the city of Williamson as his permanent domicile. The law is settled that legal residence or domicile is fixed by intention, and that leaving an established domicile for a temporary purpose with intention to return, does not effect a change of domicile. 19 C. J. subject Domicile, sec. 19; Maslin v. Hiett, 37 W. Va. 15, 16 S. E. 437; Croop v. Walton, 199 (Ind.) 262, 157 N. E. 275, 53 A. L. R. 1386, and authorities there cited.

3. Accountants and experts on value have established without controversion that Mr. Williamson was easily worth one and one-half million dollars in 1917, his personal property alone being rated at one million and thirty-six thousand dollars. The plaintiff, as his wife in 1917, would have had an expectancy in his estate approximating $400,000, under the laws of West Virginia. The provision of $21,000 in the antenuptial contract is so unreasonably disproportionate to $400,000 as to require no comment. The cases cited by defendants against disparity are so different from the one at bar that they have no persuasive force, no matter what dicta they contain. For example, defendants' brief quotes at length from *Suhor* v. *Gooch*, 244 Fed. 361. In that case the antenuptial contract provided the wife with $50,000 when her expectancy in his whole property amounted to $70,000 to $80,000. The court found that "the marriage was one of convenience with a large factor of mercenary consideration rather than of sentimental attachment;" that the wife was educated and intelligent; and that there was "positive and unassailed proof of full disclosure" of the value of the husband's property. Again, several pages from *Bibelhausen* v. *Bibelhausen*, 159 Wis. 365, 150 N. W. 517, are also quoted. That case is long and time is fleeting. My interest flagged when the opinion disclosed that while the antenuptial contract gave the wife $500.00, the husband gave her by will the household goods absolutely and $15.00 a month for life; that his attorney exercised "care *ex industria*" in the execution of the contract "to see that she was not imposed upon;" that his entire estate was valued at $13,000; and that "the great bulk of the property possessed by Mr. Bibelhausen at the time of his death was acquired after his marriage with respondent." It would be supererogation to say more than that all the material facts in *Suhor* v. *Gooch* and *Bibelhausen* v. *Bibelhausen* are different from the material facts in the instant case.

Courts have sometimes upheld a disproportionate contract without full disclosure when the parties married late in life, if the provision was adequate for the wife's confort, on the ground that the wife would otherwise reap where she had

not sown. See *Appeal of Neely*, 124 (Penn.) 406, 16 Atl. 883. In the instant suit, however, plaintiff had given Mr. Williamson thirty of the best years of her life. She had "borne with him the sacrifice and labor of accumulation." The trial chancellor details her part as follows: "She looked after the home and assisted in the store. When Mr. Williamson went to Catlettsburg with timber she would give the men instructions as to their work, provide them with tools and look after the interests of Mr. Williamson as best she could during his absence. There is nothing in the record to indicate that the children or relatives of Mr. Williamson assisted him or had any part in assisting him to accumulate his wealth, but on the contrary the evidence clearly shows that Ellen Blair did much to assist him in rising to the position he held in the financial world at the time of his death. * * * That Ellen Blair gave her life completely to Wallace J. Williamson cannot be contradicted." It is suggested that the 103 acres he conveyed her in 1915 extinguished all his prior obligations to her. That conveyance may be said to satisfy all strictly financial claims. But it did not purport to recompense her for thoughtful care of him in health, and loving service to him in sickness—care and service comparable to that of the most devoted wife, and for which no charge was reckoned. Dr. Nunemaker (defendants' witness) testified that at the October, 1916, conference the parties discussed an agreement "whereby he (Mr. Williamson) could do something for her, provide for her in some way" in case they separated. This discussion demonstrates that Mr. Williamson did not consider himself discharged from all obligations to plaintiff by the 1915 conveyance.

In passing it may be pertinent to say that I would not appear as an apologist for the illict conduct of the plaintiff. However, I remember her youth and inexperience when it began. I am not unmindful that if it commenced before his second marriage, it was under promise of marriage to her; and if afterwards it was under a great love which was then hopeless. In either event, I will let some other "cast the first stone."

The right of dower is of such antiquity that its origin cannot be traced. It was recognized in the great charter of 1215. It was appreciated so highly by the early writers on the common law that Lord Bacon is accredited with saying (in 1641) it was "the common by-word in the law, that the law favored three things; (1) life, (2) liberty, (3) dower." *Speckman* v. *Speckman,* 15 O. App. 283, 286. 9 R. C. L., subject Dower, sec. 4. From those early times to the present it has been most highly esteemed and carefully-guarded by courts and statutes. The amount of dower a wife is to receive from her husband's estate is not fixed by the husband, or the heirs, or the courts, but *by the statute.* What the husband or the heirs or the courts may deem adequate for a wife cannot primarily defeat the statute. Her assent thereto is requisite. The expression of the leading authorities is that courts will "rigidly scrutinize" (Schouler, *supra*) settlements in lieu of dower, and ordinarily will not permit a man to bind his proposed wife to take less than the statutory interest unless she has full information of what she is doing. Also the burden is imposed on those who would profit by the settlement to show that the woman had that information. The defendants here offer little evidence on that subject, depending mainly on plaintiff's statements. She said of Mr. Williamson's property, "Of course I knew he had a little more than anyone else, or I thought he had, but I didn't know in what way." She named several tracts of real estate which he owned at that time but denied knowing their value. She knew that he had started a bank in the city of Williamson, but disclaimed any information of how much bank stock or other corporation stock he held, stating that he was not in the habit of discussing his business with her. *Her testimony on this subject is not controverted in any manner.* Her inability to appreciate values is corroborated by Miss French (defendants' witness) who testified after intimate association with plaintiff for twelve years that she understood numbers and could count only to a limited extent, and that when the witness first met plaintiff (in 1917) she could not figure out the change due her from a twenty-dollar bill, on a small purchase. Plaintiff's ignorance of the extent of Mr. William-

son's holding might appear singular in view of their intimacy, were it not for the fact that he was secretive about his business affairs and none of his closet friends and business associates had any definite idea of the extent of his estate in 1917. Alexander Bishop, who had been closely associated in business with Mr. Williamson for thirty years, explained his ignorance thereof by saying that Mr. Williamson "never talked about his business and his stock * * * he kept it as his own secret." If his confidential business associates had not been told the extent of his holdings, I see no reason for inferring that he had told plaintiff. "The mere fact that an intended wife who signs an antenuptial contract knows in a general way that the hsuband is reputed to be a wealthy man and to own farms and an interest in banks is not sufficient to meet the requirements of the equitable rule of fair disclosure or charge the wife with such knowledge of the nature and value of his property as to render an unfair contract binding upon her." *In re Enyart*, 100 Neb. 337, 160 N. W. 120. In a similar case, the supreme court of Illinois said: "The circumstance of his reputed wealth is entitled to but little weight as tending to prove that she knew the nature or value of his property. The reputation of persons as being rich or wealthy is too indefinite and general to charge those who deal with them, with knowledge of the kind and amount of property they are possessed of." *Hessick* v. *Hessick*, 169 Ill. 486, 493, 48 N. E. 712, 715. Mr. Williamson's real estate and the bank stock constituted just about one-half of his wealth in 1917, and it is not even shown that she knew the value of those items. This observation is confirmed by the trial chancellor who said: "It is true that she knew he had some real estate and was President of the First National Bank, but there is not one scintilla of evidence to indicate that she had the slightest idea as to what he was actually worth or what his property consisted of."

There is also no evidence that plaintiff even knew what the law would secure to her as a wife, or that she was informed she would receive less under the contract than under the law. "It cannot be denied," said the supreme court of Ken-

tucky, "but that it is the settled rule that the prospective wife, in contracts of this character, in order to be bound thereby, should, before entering into the contract and at that time, be apprised of the nature and extent of her prospective husband's estate *and the value of her marital rights therein which she* by its terms is surrendering." (Italics mine). *Stratton* v. *Wilson,* 170 Ky. 61, 67, 185 S. W. 522, 525. JUDGE LIVELY recognized this requirement in *Dehart* v. *Dehart, supra,* saying: "The courts scrutinize an antenuptial agreement to ascertain if it be fair in its provisions for the wife, and that she entered into it with full knowledge of the fact of her right, and without the exercise of undue pressure or influence upon her."

The plaintiff was contradicted as to her ignorance of the provision of the contract in recent years by four witness who are residents of other states, and had separately conversed with plaintiff. One of these is the wife of a defendant, and the other three are admitted friends of the defendants. These four witnesses may be worthy of all credence. On the other hand, had plaintiff been given to falsity, I am sure that her reputation would have overtaken her in the record. There is nothing there against her reputation for veracity, and the trial chancellor did not treat her as untruthful. Ordinarily we leave it to the trial court to pass upon conflicts in the evidence. If the testimony of the several strangers from the other states is to be accredited, however, (and the majority has said so), that evidence in no way affects what took place prior to and at the execution of the contract, and still does not sap the plaintiff's position. The facts that plaintiff executed the contract knowing that it disposed of her prospective right of dower, and that she remembered the contract in after years, do not exculpate Mr. Williamson. Said Lord Eldon in *Huguenin* v. *Basely, supra,* "The question is not whether she knew what she was doing, had done, or proposed to do, but how the intention (to do) was produced; whether all that care and providence was placed round her, as against those who advised her, which from their situation and relation in respect to her, they were bound to exert on her behalf." The record discloses "no care and provi-

dence" placed around plaintiff by Mr. Williamson as against his own influence over her. "If influence is acquired," said Story, *supra,* section 431, "it must be kept free from the taint of selfish interests and cunning and overreaching bargains."

It was suggested in conference by the majority that because Mrs. Williamson was contradicted by the four strangers (to this court) she did not come into equity with clean hands. Upon an examination of the law, however, I find the clean hands rule is "confined to misconduct in regard to the matter in litigation, so that it has in some measure affected the equitable relations between the parties, arising out of the transaction." *Foster* v. *Winchester,* 92 Ala. 497, 9, So. 83, 84. Accord: *Bias* v. *Bias,* 109 W. Va. 621, 155 S. E. 898; *Ihrig* v. *Ihrig,* 78 W. Va. 360, 365, 88 S. E. 1010; *Heck* v. *Morgan,* 88 W. Va. 102, 106 S. E. 413; *Kinner* v. *Ry. Co.,* 69 Ohio St. 339, 344-5, 69 N. E. 614; *Trice* v. *Comstock,* 121 Fed. 620, 628; Bispham, Principles of Eq. (7th ed.), section 42; Beach, Modern Eq. Juris., section 16; Story's Eq. Juris. (14th ed.), section 100; Pomeroy's Eq. Juris. (4th ed.), section 399. The matter in litigation is the execution of the contract. The contradictions of plaintiff's later statements by the four strangers may imply misconduct on her part, but it is not misconduct connected with the preparation or execution of the contract, or mis-conduct which is shown to have affected in any way *the equitable relations* between herself and Mr. Williamson or his representatives. Consequently the cleanhands rule does not apply.

It is within the province of the majority to scrutinize the testimony and conduct of the plaintiff both prior and subsequent to the contract as it has done. But a primary duty rests on the majority to scrutinize the conduct of Mr. Williamson, which it apparently has not done. Even a casual examination of the facts leading up to the execution of the contract discloses (1) that Mr. Williamson desired to pay the debt he had so long owed to plaintiff and to society, but at a heavy discount to himself and his estate; (2) that he had astute counsel prepare the contract with the sole purpose of securing that advantage; (3) that plaintiff had no part in

the preparation of the contract; (4) that he surrounded him-self with friends and counsel when he presented the contract to her for execution; and (5) that she was alone, over-wrought, uncounselled, and without information of the extent of the prospective rights she signed away. The trial chancellor specifically found: ''There is every reason to believe that every advantage was taken of the complainant in and about the preparation and execution of the contract. In answer to the question propounded 'was the contract fairly entered into'? this court answers it was not.''

The fact that plaintiff may have greatly desired the marriage did not give Mr. Williamson the right to ignore her lack of information. It may be that she even would have accepted any terms dictated by him as the price of marriage; but neither that probability nor the illicit relation of the parties prior to their marriage makes their marriage settlement any exception to the general rule. Such an idea, declared Judge Cabell in *Coutts* v. *Greenhow*, 2 Munf. 363, 372, 5 Am. Dec. 472, was ''suported neither by authority nor reason.'' Why ignore this violation by Mr. Williamson of the equitable principles prescribed by all writers on jurisprudence, and adopted and pronounced by this court? Why say we will ''scrutinize'' contracts of this nature if such overreaching (as this scrutiny reveals) is to be ignored? Is the statement more rhetoric? The excuse suggested is that plaintiff in her own right was worth some thirty-five or forty thousand dollars in 1917, and that the addition thereto of the twenty-one thousand dollars provided in the contract makes an amount adequate for her needs. That may be correct. But a strong objection to that excuse is, if adequacy is made the test, then we have an unstable rule. Adequacy varies as conditions change. What one court might consider sufficient, another might deem insufficient. The court would attempt to judge of adequacy from the standpoint of the woman, which would certainly be unsatisfactory to the court as well as to the woman. This test is also incomplete. It complies with only part of the established rule which was recognized by JUDGE LIVELY in *Dehart* v. *Dehart, supra,* and which requires in addition to

adequacy, that the contract be scrutinized to ascertain if the wife "entered into it with full knowledge of the fact of her right; and without the exercise of undue pressure or influence upon her." The test prescribed in *Dehart* v. *Dehart* and by Pomeroy, Story, and all the leading authorities is complete. How much fairer and more satisfactory to adhere strictly to the complete rule and permit the woman uninfluenced to fix the sum she deems adequate for the sale of *her own right*, after she has had full information of the value of that right.

The case of *Slingerland* v. *Slingerland*, (Minn.) 132 N. W. 326, 327 is comparable to this one on all material points. The facts, as stated in the opinion, were as follows:

> "Plaintiff and defendant were married June 18, 1890. Defendant was a widower 67 years of age, and owned property worth $225,000, and was carrying on a prosperous business bringing in large profits. Plaintiff was 23 years of age and possessed of little property, except possibly 240 acres of land, for which defendant had before that time made a deed to her, the delivery of which deed was a matter of dispute at the trial. For several years prior to the marriage plaintiff and defendant had maintained illicit sexual relations with each other, and at the time the contract was executed plaintiff was pregnant with child begotten by defendant. After she so became pregnant plaintiff greatly desired defendant to marry her, and urged him to do so. Defendant consented to such marriage, and with a view to the same plaintiff and defendant, on May 20, 1890, went together to the office of defendant's confidential counsel in Winona, who at defendant's request had prepared the antenuptial contract in controversy and made three copies thereof ready for signature, and plaintiff and defendant then executed and acknowledged such contract. The nature of the contract was at this time explained to plaintiff by the attorney who had drawn it, its import was then understood by her, and she then knew that by its execution she would, in case she survived defendant, be excluded from any right in whatever property he might own at the time of his death in consideration of the sum of $5,000 to be paid to her as a condition of her executing such contract. Plaintiff then knew that defendant was wealthy and the owner of much

valuable real estate and personal property; but was not informed by defendant as to the full amount of his property or as to the details of the same; nor was she informed of the exact nature or extent of the interest that she as a widow would be entitled to under the law in the property of which defendant might die seised nor did she make any inquiries as to these matters. Plaintiff executed the contract freely and without objection, and without urging on the part of defendant or his attorney; but she then was, owing to her condition and the fact she had not been married to defendant, under considerable nervous strain and greatly desirous of a marriage with defendant, as he then well knew, and had confidence in the good intentions of defendant and his affection for her. She had no person of business judgment and experience with whom to advise in reference to such contract. Shortly after its execution the marriage took place.''

In the instant case, the plaintiff was not pregnant, but the pregnancy of Mrs. Slingerland was not given major consideration by the Minnesota court, which held:

"These facts, without actual misrepresentations, urgings, or duress, are sufficient, in our opinion, to justify a conclusion that plaintiff's execution of the contract was not her own free act, but in reality the act of defendant done by her pursuant to his will. * * * True, mere inadequacy of consideration alone is not generally a ground for setting aside a contract. But it shows the unconscionable character of the contract, and raises a presumption of fraud, which may be overcome by evidence. The relations between the parties were confidential. Clearly the burden rested upon defendant to overcome this presumption, to show there was no fraud or concealment, and that plaintiff knew the extent, character, and value of his property and the nature and extent of her rights as his wife and widow. This burden was not sustained by proof that plaintiff knew he was wealthy.''

I see no way to differentiate the instant case from the *Slingerland* case. I see no reason to except the instant case from settled equity principles, and would hold that the de-

fendants have not sustained the burden imposed upon them by law.

4. Defendants also contend that as plaintiff accepted the $1,000 cash mentioned in the antenuptial contract, she is estopped after the lapse of so many years to have the contract set aside. · At the time the contract was signed, she and Mr. Williamson executed deeds exchanging certain properties. She testified that she understood the $1,000 was paid to her to make the exchange. The circuit court found specifically in her favor on this evidence, and that no estoppel arises. I cannot say the finding is wrong. However, since the $1,000 was accepted by plaintiff, I would deem it just for the administrator to charge her with that sum and its accrued interest.

I would modify the decree of the circuit court as to this $1,000 and also as to the domicile of Mr. Williamson at the time of his death, and so modified would affirm it.

Judge Maxwell authorizes me to say that he concurs in this dissent.

LITZ, JUDGE, (concurring) :

In view of the vigorous dissent of Judge Hatcher, who wrote the opinion, the position of the court should be more fully stated.

As the Court of Appeals of Kentucky said, in *Daniels* v. *Banister*, 146 Ky. 48, 141 S. W. 393, ''This is not a case where the husband took advantage of the youth and inexperience of a woman whom he intended to marry, concealed the character and kind of his property, and persuaded her to enter into a contract whereby she relinquished all claims to his property in consideration of an insignificant settlement upon her.'' In the language of the learned court below, ''A review of the cases pertaining to antenuptial contracts, which have reached the highest courts of the land, leads the court to the conclusion that the decision in each case was based upon the particular facts of that case.''

The rule thus stated is firmly established by a general concurrence of authority. ''A court of equity, when called upon to consider an antenuptial contract, should examine and con-

strue the instrument *in the light of the circumstances surrounding the particular case,* and enforce or annul the agreement according to the facts disclosed in the case before it. No arbitrary rule can be laid down which would apply to all antenuptial arrangements." *In re Magg's Estate,* 119 Neb. 237, 228 N. W. 537; *Rieger* v. *Schaible,* 81 Neb. 33, 115 N. W. 560.

"As a general rule, *,* * if the provision made for the wife is unreasonably small in proportion to the estate of the husband, this fact alone raises the presumption of a fraudulent concealment by the husband, and casts the burden upon him or those claiming in his right to prove that the wife had full knowledge of all that materially affected the contract. *But the mere fact that the provision made for the wife is greatly disproportionate to the extent of the husband's estate will not render the contract invalid where it appears from all the evidence that the contract was reasonable under the circumstances and that no actual fraud or deceit was practiced upon the wife."* 19 A. & E. Ency. Law 1228.

In *Yarde* v. *Yarde,* 187 Ill. 632, 636, 58 N. E. 600-601, in which a marriage settlement was sustained, the court said: "It may be conceded that, if the provision made for appellee in the contract and the extent and value of Mr. Yarde's property were alone considered, there was such a disproportion between the two as to call for affirmative proof on the part of appellants to overcome the presumption of concealment and unfairness; but from a consideration of all of the competent evidence in the record we are of the opinion that the contract was not really unfair to appellee, and that, before entering into the contract sought to be set aside, appellee had knowledge of the character and extent of, substantially, all of Mr. Yarde's property, or, at all events, that *the circumstances proved were such as to charge her with such knowledge."*

Hence, in this case, whether the provision for the plaintiff in the contract is so disproportionate to the interest she would otherwise receive in the estate of Wallace J. Williamson as to create a presumption of concealment and unfairness, on his

part, depends upon the admitted and proven facts and circumstances.

Williamson, a native of Pike County, Kentucky, although unlettered, possessed sound business judgment. He was also thoroughly honest and imbued with exemplary business integrity. After his first marriage, he settled in the city of Catlettsburg, Kentucky, where his four children, Ben M., (late U. S. Senator from Kentucky), Rush F., Fannie, and Tillie, were reared. In 1884, after the death of his first wife, he engaged in the timber business on Pigeon Creek in Logan (now Mingo) County, West Virginia, where he soon became acquainted with Ellen Blair who was then about fifteen years of age. In 1885, he married his second wife who cared for the children in the home at Catlettsburg where she lived until her death in 1912. About 1890, Ellen Blair came with her brother to live in the logging camp maintained by Williamson at the mouth of Pigeon Creek, fifteen miles west of the present site of the city of Williamson. The timber business kept him a great part of the time at Pigeon Creek, then practically a wilderness. Hence, the continuation of an illicit relation between him and Ellen Blair, which, according to the evidence, began about the time she took up her residence at his logging camp.

While engaged in timbering at Pigeon Creek, Williamson purchased a large tract of land in the county and laid out thereon the city bearing his name, which he later promoted and developed through Williamson Mining & Manufacturing Company, a corporation. He assisted in the promotion of the first bank in the municipality, known as the Bank of Williamson, and later, organized the First National Bank of Williamson, of which he was president from its organization in 1903 until 1928. He later organized and managed the South Williamson Land Company through which he promoted and developed South Williamson, Kentucky, connecting it with Williamson, West Virginia, by a bridge, across Tug River, owned and operated by Kentucky & West Virginia Bridge Company, which he also organized and managed. He dedicated sites for the courthouse, jail, hospitals, schools, water plants and churches in the city of Williamson.

His personal property at the time of his marriage to Ellen

Blair consisted of 680 of 1,000 outstanding shares of First National Bank of Williamson, 1264 of 1690 outstanding shares of Williamson Mining & Manufacturing Company, 455 of 500 outstanding shares of South Williamson Land Company, and 238 of 250 outstanding shares of Kentucky & West Virginia Bridge Company. His real estate was situate on Pigeon Creek and in and around the city of Williamson. Plaintiff realized his predominant ownership in the several corporations. When asked whether she had been informed that he was a rich man, she said: *"I knew he had a little more than anyone else, or I thought he had * * *. I knew he owned some land and had a bank and things like that."* One of her witnesses (N. G. Rosenfeld), who settled in Williamson some years after the marriage, testified that immediately upon his arrival in the city he was informed that Wallace J. Williamson was the only millionaire in the community. Williamson had made his fortune in and around the city of Williamson while living with Ellen Blair. She says he always informed her of his losses or reverses in business; and, according to her testimony, she at least partially supervised the logging business in his absence. She also takes credit for aiding in the purchase of the site for the city of Williamson by advising him, through a special messenger, that the property was for sale. Notwithstanding her want of education, she, nevertheless, possessed ample intelligence and business acumen. She not only conducted her own business affairs intelligently, but served as administratrix of her father's estate; and, according to her testimony, decided to bring this suit and engaged three prominent attorneys for the purpose, without consulting any of her friends or relatives. Some years after her marriage, she advised the compromise of a personal injury claim asserted by one of her brothers against the Norfolk & Western Railway Company, and applied the proceeds from the settlement to the construction of a residence for him. The record discloses a number of conveyances of real estate to and from her, including a conveyance by her of right of way to Norfolk & Western Railway Company in 1903 for a consideration of $3,600.00. These are some of her business transactions incidentally appearing in the record.

· January 18, 1915, three years after the death of his second wife, ·Wallace J. Williamson conveyed to Ellen Blair real estate in. the town of Naugatuck which (with a few small lots previously owned by her) she proved by one Huff Waldron ·(who lived near the property) to have been worth at that time from $30,000.00 to $35,000.00. At the same time, she executed a writing releasing him of all claims that she might have against him, except a note of $3,500.00 for borrowed money.· In May, 1916, during a serious attack of pneumonia, he was attended by Miss Clara G. French, a trained nurse. Upon recovering sufficiently to travel, he went to Ashland, Kentucky, to the home of one of his daughters, and then, accompanied by a daughter, son, and Miss French, to Denver, Colorado, for treatment. On or about October 1, 1916, soon after. his return to Williamson, he took with him Dr. Tunis Nunemaker and Alex Bishop (a former sheriff and member of the county court of Mingo county) to the home of Edna May ··Williamson, sister of Ellen Blair, to witness a conference between. himself and Ellen to decide whether he should make further provision for her and end their relations or come to some ·agreement with her with a view to marriage. Immediately; after this conference, lasting several hours, in the absence, for· the most part, of Nunemaker and Bishop, Williamson ·and Ellen Blair, in. the presence of each other, announced ·to Nunemaker and Bishop that they had settled ·their. differences, she stating further: ''I am not to have or interfere with any of his property and he is not going to interfere with any of mine; we will both control our property separately:'' From this and other evidence, it is obvious that Wallace J. Williamson and Ellen Blair came to an agreement at that conference to marry *upon condition of a marriage settlement.* Thereafter, Williamson employed S. D. Stokes, a local attorney, to draft a formal contract (evidently) in conformity with and pursuant to the informal oral agreement. Later, the contract, as drawn by Stokes, was redrafted by · Judge John F. Hager of Ashland, Kentucky, and mailed by ·him. as ·redrafted from Ashland to Mr. Williamson, at Williamson, December 23, 1928.

The. plaintiff proved by A. C. Pinson, a subscribing wit-

ness to the contract, that on the day before it was executed, Williamson called the witness to his office to discuss with him the advisability of the marriage, at the time requesting Pinson to appear, when called, to witness the execution of the contract, which Williamson then explained to Pinson, *stating that it had been agreed to by him and Ellen.* This same witness, at the instance of plaintiff, also testified that immediately before the agreement was signed by the parties, in response to the proposal of the notary to read the instrument aloud, Williamson stated in the presence of Miss Blair and with her apparent acquiescence and approval, *"That they had gone over these papers* (the contract and deed of exchange) *carefully together and they both knew the contents and it was not necessary to read them."* G. R. C. Wiles, a prominent attorney, who endorsed his name to the contract as a subscribing witness, and a notary, taking the acknowledgment of the parties thereto, testified that it seemed to him everybody in the city of Williamson knew before the marriage that Mr. Williamson and Ellen Blair "were about to get married; that they had made an antenuptial agreement and she was to get $20,000.00 when he died." The existence of such report and understanding among the people in the city of Williamson, immediately before the marriage, is in no way denied or controverted on behalf of plaintiff. The interest thus created was so pronounced that some of the officers of Williamson's bank feared that the marriage would injure its business. Wiles testified further that the substance of the contract was discussed in the presence of Ellen Blair immediately before its execution, and that she seemed pleased and to understand its provisions. Dr. Nunemaker, the other subscribing witness, testified that immediately before the contract was executed, Williamson, in response to an inquiry by Wiles as to whether the parties desired the contract read, said that *it need not be read as both parties had gone over the instrument, were familiar with its terms and perfectly willing to sign it.* He testified further that Wiles briefly stated the terms of the agreement and plaintiff seemed to thoroughly understand the transaction. The one thousand dollars cash payment provided for in the contract was paid by check which she cashed

the following day. The contract was recorded in Mingo county, West Virginia, August 19, 1918, and in Pike county, Kentucky, September 11, 1918. According to the testimony of a number of witnesses, plaintiff kept a carbon copy of the agreement and often referred to it as her "marriage contract."

After the marriage, Williamson built, without charge, a residence costing $4,000.00 or $5,000.00, on property belonging to her in South Williamson, which he had exchanged with her for the Naugatuck property.

The marriage was one "of convenience only." Nancy Jane Evans, as a witness for plaintiff, testified that Williamson told her some weeks before the marriage "he could have made" Ellen his second wife, "but she was uneducated and he didn't think she was a *proper companion for his daughters.*" William Damron, deputy clerk of the county court who issued the marriage license, at the instance of plaintiff, testified that Williamson at the time requested him to keep the matter a secret, stating that he was going to marry Ellen, notwithstanding the vigorous protest on the part of his family, because *"he thought he owed it to her."* The marriage was deferred until the marriage settlement could be executed. The minister who performed the ceremony came from his home in the country several days before, awaiting the pleasure of the parties. The marriage resulted from his choice of one of the two alternatives (disclosed by him to Alex Bishop and Dr. Nunemaker): (1) of making further provision for her and terminating their relations, or (2) of marrying her upon condition of a marriage settlement.

Wallace J. Williamson at the time of the marriage was practically an invalid and remained so during the rest of his life. Miss French, who had been temporarily discharged, returned a month after the marriage, and remained with him until his death. She says that plaintiff assisted her very little in caring for Mr. Williamson. He had four children and five grandchildren at the time of the marriage. In view of this fact, the condition of his health, his advanced age and his previous transfers of valuable properties to her, he was naturally unwilling to enter into a marriage engagement with

Ellen Blair except upon condition of the marriage settlement. The property he was giving her with that she already possessed would provide her a comfortable support. She was, under the circumstances, entitled to no more.

Plaintiff denies the execution of the release of January 18, 1915, and the marriage settlement of January 2, 1917, and knowledge of either transaction; says that nothing of importance was discussed between her and Mr. Williamson at the conference attended by Bishop and Dr. Nunemaker; and goes so far in feigning ignorance as to claim that she never heard of the contract until after Williamson's death, although it had been spread upon the public records of Mingo county, West Virginia, and Pike county, Kentucky, about 18 months after its execution, and was a topic of general discussion in the community before and after the marriage. Her testimony, in so far as it deals with alleged conversations between herself and her deceased husband is inadmissible; and in view of the admitted and proven facts and circumstances and the numerous contradictions of her statements on material issues by many disinterested witnesses, the remainder of her self-serving testimony is worthy of little, if any, credence.

Those advocating her cause mistakenly ignore the cardinal rule governing marriage settlements, already pointed out, by overlooking the admitted facts and circumstances in the case, clearly establishing the fairness and reasonableness of the contract, and the proven fact that Wallace J. Williamson entered into the marriage engagement solely upon condition of the marriage settlement. Hence, in selecting the vital issue in the case, they would consider merely the pecuniary difference between the contractual provision and her reasonable expectancy under the statute. They say this difference is so great as to create the presumption that she was induced to enter into the contract as the result of fraud practiced upon her by her deceased husband, which can be overcome only by proof that she knew, at the time of executing the agreement, the character, extent and value of his property and the nature and value of her reasonable expectancy in his estate under the statute; that defendants have not sustained

the burden of proof thus imposed upon them; and that a decision in her favor necessarily results.

Whether the provision in an antenuptial contract for the benefit of the prospective wife is grossly disproportionate to her reasonable expectancy in the estate of the intended husband depends upon the fact and circumstances of the particular case. In *Suhor* v. *Gooch*, 244 Fed. 361, an antenuptial contract, giving the woman, during widowhood, *"the interest"* on fifty thousand dollars of the man's estate, valued at two hundred and forty thousand dollars, was upheld as a reasonable settlement, in view of the facts and circumstances of the case. In an able opinion, written by the late Judge Charles A. Woods of the Fourth Judicial Circuit, it is said: "What is gross disproportion (between the marriage settlement and the statutory expectancy) *depends upon all the circumstances appearing at the time of the making of the contract. It is not to be inferred from the mere fact that the settlement is considerably less than it turned out the wife would have got but for the settlement,* any more than gross excess is to be inferred from the fact that the settlement gave considerably more than it turned out the wife would have got but for the settlement. If that were the test, settlements would be of little, if any, value."

In *Smith's Appeal,* 115 Pa. 319,. 8 Atl. 582, a marriage settlement giving the prospective wife, during widowhood, the income from $12,500.00 was upheld, although the husband was worth $179,000.00 at the date of the contract, and $391,000.00 at his death. At the time of the marriage, the woman was a widow, forty-three years old, and the man a widower, fifty-two years of age, with a family of six children. In the opinion of the court it is stated: "We cannot say that the provisions made for her (the wife) was so disproportionate to his means as to create a presumption of fraud and concealment. She was a second wife, past middle age, and her husband had a large family of children living. She was not the mother of his children, nor had she aided him in the accumulation of his fortune. Situated as the appellant was at that time, she probably thought that a provision of about $1200.00 a year after her husband's death was reasonable. At

any rate, she agreed to it, and having enjoyed the benefits of the contract, she cannot now repudiate it for no better reason than that she would like to have more.''

In *Neely's Appeal*, 124 Pa. 406, 16 Atl. 883, 10 A. S. R. 594, a marriage settlement giving the wife $600.00 annually for life out of an estate of more than $30,000.00, was upheld. The woman was a spinster, aged fifty years, owning property of the value of $12,000.00. In the opinion, the court said: *"When we consider the question of the adequacy of the provision, we must regard all the circumstances surrounding the case.* This was a marriage between persons well advanced in years. The appellant was not the mother of his children, nor was she likely ever to bear him any. She had not in any way aided him to accumulate his fortune. She had $12,000.-00 of her own, all of which he relinquished. In addition, he gave her $600.00 per year during her life. *What claim had this old woman, marrying this old man, to come in and take one-third of his estate away from his children,* and yet retain the whole of her own? She would, of course, have had a legal claim had he married her without an antenuptial contract; but she had no claim which made it inequitable or unjust in him to insist upon the execution of the contract before the marriage. *It would have been a wrong to his own blood had he not made some such arrangement. It was not a liberal provision, but it was adequate.* She retains all of her own estate, and has now, in addition, $600.00 per year, besides a comfortably furnished home. Surely her last condition is better than her first. There is a marked distinction between this case and that of a young couple just entering upon the voyage of life. In the latter instance they grow up together; the wife is the mother of his children; she shares his burdens in his early struggles, and often by her thrift and economy materially aids him in the accumulation of his fortune. To cut off such a wife with a mere support during life would be as unjust as it would be ungenerous. But when a man in the decline of life, who has been twice a widower, for the third time leads a woman to the altar, and an elderly woman at that, it is very different. In this case the wife reaps where she has

not sown, and if she is provided with a comfortable support after her husband's death she has no just cause of complaint. In any event, if she is dissatisfied, she ought to refuse to sign the contract, and not accept its benefits during her husband's life, and then seek to repudiate it after his death.''

In *Wellington* v. *Rugg*, (Mass.) 136 N. E. 831, where the marriage settlement gave the woman $5,000.00 out of an estate of $400,000.00, the court said that notwithstanding the confidential relation between the parties to an antenuptial contract (by reason of a prior marriage engagement), the simple failure of the husband voluntarily to disclose the value of his property is not actionable fraud where, so far as appears, the wife could have made inquiry or such investigation as she saw fit.

In *Stevens* v. *Stevens*, (Ky.) 205 S. W. 573, the court sustained a marriage settlement between a man, eighty, and a woman from thirty to forty, giving her $1,000.00 out of his estate, at the time estimated to be worth from $30,000.00 to $40,000.00, saying, *"If decedent's purpose in securing the contract was to satisfy his children, it was not in any way unworthy, nor did it in any way affect the valdity of the contract.* Contracts of this kind are usually made for some such purpose. *So long as fraud or undue influence are not used upon the wife, the contract is valid and binding.''*

In *Gaines* v. *Gaines*, 163 Ky. 260, 173 S. W. 774, the court upheld a marriage settlement between a man 73 and a woman 47, giving her $5,000.00 of his estate valued at $150,000.00. In the opinion it is said: ''The age, position in life, and the circumstances surrounding these parties all tend to show that each of them was capable of protecting his interest. * * * It was not, we may assume, a love affair between this couple, in the ordinary meaning of these words, but was rather a marriage of convenience. Mrs. Gaines was doubtless glad to exchange the drudgery and confinement of keeping a small postoffice for the position of *wife of the richest man in the community, and Mr. Gaines no doubt thought that, upon entering into a marriage relation at so late a period in his life, it would not be fair to his children, unless some property arrangements were made such as would give to his wife a fair*

income; and yet not take from his wealth, in the creation of which she had no part; the large sum the law would give her in the absence of a contract."

Most, if not all, of the cases cited involved prior marriage engagements. The rigorous rule governing in such cases, and stressed in behalf of plaintiff, presupposes a prior marriage engagement between the parties, and certainly should not operate with the same degree of strictness in a case like this where the marriage engagement arises out of, and serves as the consideration for, the marriage settlement. The unwillingness of a man to enter into a marriage engagement without a marriage settlement should prompt the woman to independent judgment. She is thus put upon inquiry, and cannot, as in the case of a prior marriage engagement, remain passive under the assumption that the marriage settlement is being made for her benefit. "The reason for the rule is that *while parties are engaged to be married* the relation is confidential, and the intended wife is supposed to place confidence in her husband." 1 Schouler, Domestic Relations, (6th Ed.), p. 521. But conceding that the rule applies to a marriage settlement which is a part of the marriage agreement as here and that there was a confidential relation between plaintiff and Wallace J. Williamson at the time of the antenuptial contract, she is not, under the facts and circumstances, entitled to relief. As already stated, a reputable witness testified *at her instance* that Williamson advised him before the execution of the formal contract that the settlement had been agreed to; and that she signed and acknowledged the writing with apparent satisfaction after Williamson stated in her presence that he and she had gone over the paper carefully together and understood its contents. Defendants show further, without denial, that the general public were given advance information of the arrangement between the parties. Her several brothers and sisters, as well as friends, living in the community (including her brother Frank, who says he "helped her trade"), doubtless would have voluntarily advised her against the undertaking had they thought it an unwise bargain. She, as an intimate of Williamson, could not have overlooked the growth of his

fortune in the vicinity, and is, therefore, charged with such knowledge. She admits she thought he had more property than any one else.

*Slingerland* v. *Slingerland*, 132 N. W. 326-328, (involving an antenuptial contract between a man of mature years and a young woman who was pregnant by him), so firmly relied on in the dissent, differs from this case as follows: (1) The suit in that case was brought in the lifetime of the husband after he had failed for twenty years to comply with his promise to pay consideration for the contract "within a reasonable time after the marriage." (2) The woman there was practically penniless and had borne the man four living children. In this connection, the court said: "By this contract, if valid, defendant had it within his power to leave his wife practically penniless at his death, and without the means to support the children she might bear him. She has been his wife for 20 years, and four children of the marriage are living. The power to cast her and them from him, without a share of his great wealth, is abhorrent to every sense of justice, and equity should not be powerless to grant relief." Here, there are no children and none could reasonably have been anticipated at the time of the marriage. The woman in this case has an estate, including the twenty thousand dollars to be paid under the contract, of an estimated value of fifty to eighty thousand dollars. She has told others that she is worth $75,000.00. M. Z. White, a prominent business man of Williamson, who is familiar with her property, says it is worth from $70,000.00 to $80,000.00. She owns the home in which she lives and receives monthly $325.00 rental from her other real estate. The man she married maintained her in comfort during their unmarried and married relations, and bequeathed her at his death, the furnishings of a well equipped home, a Lincoln automobile, and other personal property which she still retains. (3) The contract in that case followed a marriage engagement; the contract here was a condition of the engagement. (4) The woman there was under great mental stress in a desire to conceal her shame and legitamatize her unborn child. The woman in this case does not seem to have experienced any moral qualms because of her previous improper relations with the man who was consenting to

marry her upon condition of a marriage settlement, and the only reason she gives for preferring the marriage to a continuance of those relations was her fear, in the latter alternative, of personal violence at the hands of one of his sons. (5) The woman there was young and inexperienced and "had no person of business judgment and experience with whom to advise in reference to such contract." The woman in this case was of mature age and seasoned business judgment, and had relatives and friends to advise her. (6) The contract in that case was known only to the parties and the attorney, representing the man, who prepared the writing. In this case, the agreement reached between the parties was generally known in the community before its execution. (7) In that case, the woman knew only in a general way that the man was wealthy. Here, the woman lived with the man while he was acquiring his fortune in the same community. She could not, under the circumstances have failed to realize the extent of his wealth, and does not even claim that she thought it was less than its actual value. She knew, or at least thought, he was worth more than anyone else. She does not claim he was richer than she thought. On the contrary, her evidence indicates, as is usual in such cases, that she had overestimated his wealth. Expert accountants, testifying for plaintiff, fixed a theoretic valuation of Williamson's personal property, at the date of the contract, of $1,036,000.00. The valuation of his real estate as of that time was also, at best, a mere estimate. His estate, which had greatly increased during the intervening years, upon his death, was appraised at $824,911.96. (8) In that case, the man did not agree to the marriage simply to make "reparation for the wrong done" the woman. "He was making her his wife, the companion of his declining years, the mother of his child." Here, the man, an invalid in old age, was marrying the woman because "he thought he owed it to her."

It is said that the agreement announced by the parties at the termination of the conference attended by Bishop and Dr. Nunemaker is not sufficiently definite as an antenuptial contract and is further ineffectual because of the statute of frauds. This is all very true; but it is equally true that the facts and circumstances show the written con-

tract (reciting that it was made "upon negotiations for" marriage) to have been prepared and executed pursuant to and in conformity with the informal agreement.

Marriage settlements are formed as promoting providence and domestic happiness especially where the husband has other claims on his bounty. "Public policy does not inhibit settlements between persons contemplating marriage. Such agreements are ordinarily regarded with favor, as tending to adjust family disputes, and as making for the welfare of the parties. Therefore, the courts will seek to uphold them, and, in order to do so, will, if necessary, strain to the uttermost the interpretation of equivocal words and conduct." 1 Schouler, Domestic Relations (6th Ed.), p. 491. "Antenuptial contracts have long been regarded as within the policy of the law, both at Westminister and in the United States. They are in favor of marriage and tend to promote domestic happiness, by removing one of the frequent causes of family disputes, contentions about property, and especially allowances to the wife. Indeed we think it may be considered as well settled, at this day, that almost any bona fide and reasonable agreement, made before marriage, to secure the wife in the enjoyment either of her own separate property, or a portion of that of her husband whether during the coverture or after his death, will be carried into execution in a Court of Chancery." *Stilley* v. *Folger,* 10 Ohio 610, 649.

In view of all the facts and circumstances, I am clearly of opinion that the contract is fair and reasonable and should be enforced.

Judges Lively and Woods concur in this note.

HATCHER, PRESIDENT (a further note of dissent):

Judge Litz has flattered the "vigorous dissent" in this suit by taking five months in which to prepare his concurring opinion (hereinafter referred to for brevity as the concurrence). He has then utterly condemned it by saying that it overlooks "admitted facts and circumstances in the case clearly establishing the fairness and reasonableness of the contract." The gravity of this charge is my apology for further comment.

## 1

From the constant iteration in the concurrence of the statement that plaintiff is a sound business woman, I infer that her business ability is one of the "admitted facts." The circumstances of her business initiative recited in the concurrence, when fully understood, evidence loyalty and solicitude rather than financial foresight. Any inference, much less admission, of her exceptional shrewdness is distinctly disproved by the undisputed testimony of her brother, Frank Blair, that she relied on his business judgment and he looked after most of her business for her. (See Record 938, 940.)

## 2

Another "admitted fact"—in the concurrence—is that plaintiff knew the "financial growth" of Mr. Williamson's fortune in 1917. The only reasons I can find in the concurrence for so postulating are (1) plaintiff said she knew then that Mr. Williamson "had a little more than any one else"; (2) N. G. Rosenfield testified that when he came to the City of Williamson in 1924 he heard that Mr. Williamson was the only millionaire there; and (3) plaintiff "was kept informed of his financial growth by his advising her of any losses or reverses in business." The record does not show what *any one else had*, so that expression of plaintiff is not illuminating. I withhold comment at present on how the rumor which Rosenfield heard in 1924 could have enlightened the plaintiff back in 1917. The proposition is so involved. I may refer it to Einstein. That financial losses or reverses are indices of financial growth is an entirely new theory (or should I say *fact?*). No wonder it took the majority five months to work it out. What a pity, what a pity, Job's comforters had not known of this philosophy! Still, it may serve a wider purpose now—it may inspirit the thousands who have been seemingly impoverished in the present depression. How wonderful it will be to inform a friend who has lost even his home because of business reverses that he has really experienced *financial growth!*

The concurrence deduces that plaintiff overestimated Mr.

Williamson's wealth in 1917. A most remarkable deduction, indeed, as the record contains no estimation whatever of his wealth by her.

### 3

The concurrence treats as *admitted* that plaintiff's present estate (augmented by the $20,000 promised in the antenuptial contract) is worth from fifty to eighty thousand dollars. It is. *established* (mark the word) that her estate is subject to a debt of $20,000 borrowed money. The concurrence does not mention this debt—*de minimis* concurrence *non curat*. But what justification is there for weighing the 1917 contract by 1929 values? Mr. Williamson paid $8,000 on January 2, 1917, for the lots he traded to plaintiff that day for her Naugatuck property. (R. 113-114.) She had notes, etc., at that time aggregating some $7,000. So it was just $15,000 which he proposed to increase *to $36,000 in 1917*, out of his fortune of one and a half million dollars.

### 4

The concurrence parades (as more "admitted facts") the statements of witnesses Pinson, Wiles and Nunemaker, respectively, that plaintiff "seemed to thoroughly understand the transaction" of January 2, 1917, that "she seemed pleased and to understand its provisions" (the antenuptial contract), and that the statement attributed to Mr. Williamson on that occasion was "with her apparent acquiescence and approval." This parade is made despite the actual admission of each of these witnesses that as far as he could recall, the plaintiff never uttered one word on that occasion. (For this admission of Pinson, see R. 298, of Wiles see R. 614-615, and of Nunemaker see R. 584.) So, the parade is made with evidence which is clearly inadmissible, being merely the unwarranted opinions of the witnesses.

I therefore conclude that the phrase "admitted facts" means facts *which the concurrence admits* but not the record.

### 5

The concurrence says the fact is *proven* (not *admitted* in this instance) that Mr. Williamson "entered into the mar-

riage engagement solely upon condition of the marriage settlement." That statement is based mainly if not entirely upon the indefinite expressions made at and in connection with the October conference. The marriage settlement as such was not mentioned in those expressions. The most which should arise therefrom is a bare inference that the marriage depended on the settlement. Inference is not proven fact, "but thinking makes it so." The concurrence has overlooked most potent testimony on this subject. Several weeks before the marriage Mr. Williamson's own cousin, Nancy Jane Evans, with the courage of the prophet Nathan, confronted him as follows: "You have taken the best part of that woman's (plaintiff) life, you had a chance to marry her and you wouldn't do it, now I am going to ask you to marry her or quit her. That kind of stuff (the way he and plaintiff were living) will do to live by, but it won't do to die by." And he replied that "he knowed it." (R. 337.) He was growing old and in poor health at that time. He knew he should not depart hence without tendering some reparation to plaintiff. *Conscience was at work.* He told William Dameron he thought he *owed* marriage to plaintiff. (R. 365.) So marriage to her was an installment on a *debt of conscience.* Under these circumstances, the concurrence cannot say without psychic power just what he would or would not have done to procure credit on that debt.

## 6

The concurrence charges that plaintiff "does not seem to experience any moral qualms because of her previous improper relations" with Mr. Williamson. I shall not assume the defense of plaintiff. However, this "first stone" is purely gratuitous, as she did nothing, and said nothing whatever about those relations or about anything else which justifies this cast. The concurrence also states that the only reason she gave for preferring marriage to concubinage was fear of his son if the improper relations continued. She did say she had heard of threats against her by his son and that she would not live with Mr. Williamson in the City of William-

son unless they were married. (R. 182.) And that is all she said. She was not tabulating her reasons for desiring marriage. I deplore such a biased construction of her evidence. If she had been a woman without moral qualms, and marriage had meant little to her, it is inconceivable that Mr. Williamson would have felt that he *owed* marriage to her. But what can the qualms of plaintiff in 1932 have to do with the performance of Mr. Williamson's legal duties in 1917? Another problem for Einstein.

## 7

The concurrence brushes aside summarily all the equitable principles advanced on behalf of plaintiff, save two, which it does not mention at all: the confidential relationship arising from their illicit association, and the requirement that the woman should know or be informed of her legal marital rights. (Even concurrences have their limitations.) In ignoring these fundamental conceptions of jurisprudence the concurrence becomes merely the reflection of "the likes and the dislikes, the predilections and the prejudices, the complexes of instincts and emotions and habits and convictions which make" the personalities of its proponents. See Cardoza's "The Nature of the Judicial Process" 167. The concurrence would even put a woman "upon inquiry" when a man discusses a property settlement with her in relation to marriage. The effect of this proposal is well depicted in a discussion of *Martin* v. *Collison,* in a brief on petition to rehear the instant case:

"The Supreme Court of Illinois has the distinction of having solemnly decided (and this Court will, if it allows this decision to stand, share that distinction) that at this stage of their courtship, and up to the time when they complete the signing of the agreement, the man may deal with the woman upon the plane of ethics upon which horse-traders are required by the law to stand. He may bring this woman whom he has chosen and who has chosen him (tentatively) for life union in the holiest and most intimate relation known to mankind, before a company of strangers where her natural sentiments, if

she is the right kind of a woman, will prevent her from asking questions, and there, by his non disclosure of facts which she ought to know and consider, introduce her to holy matrimony by such sharp practice as would cause the revocation of the license of a stock-jobber or street vendor.''

I can close this reply in no better language than the masterly criticism in the same brief of the position assumed by the concurrence as to the October conference.

''These parties either agreed to marry that day in October at Pond Creek or they didn't agree to anything. If they did agree to marry, and also agreed as to their property rights, they were in the confidential relation which made the harsh and inequitable bargain unenforceable in the circumstances. If they did not agree to anything, the incident has no bearing on the case. If we forget the record, we may take it either way. But we can't take it both ways, having made a contract out of nothing, go on and make it a contract between strangers, when the parties by making the contract became engaged persons. If the contract of October 1st. was the contract which was written in January, then the recital of the January contract that ' a marriage is intended to be shortly hereafter solemnized,' which conclusively shows engagement, must have been one of the terms of the October contract. The October 'contract' cannot be striped of everything except what is damaging to the plaintiff and still be identified with the January contract.''