## In re SELIKIN'S ESTATE.

Circuit Court, Dade County, Civil Appeal.
December 18, 1952.

Myers, Heiman & Kaplan, Miami, for appellants.

Herbert N. Schwarz and Bert Sager, both of Miami, for appellee.

STANLEY MILLEDGE, Circuit Judge.

This is an appeal from the judgment of the county judge's court of Dade County, pursuant to a jury verdict determining dower, notwithstanding a pre-nuptial agreement for the payment of a sum of money in lieu of dower. At the time the decedent, David Selikin, and the appellee, Valesca Gottgetreu, met, the former was 74 and the latter 60. Both had been married before and had adult children. They married about a year and a half after they first met. During a large part of the interval the appellee worked for defendant as his housekeeper both in New York City and in the Catskills. The pre-nuptial agreement, by which the decedent promised to pay $7,000 in semi-annual instalments of $700 in lieu of dower, was made on June 16, 1947; the marriage was on October 28, 1947. The decedent died, testate, November 9, 1951. In opposition to the widow's claim of dower the executors set up the agreement. To try the issue of the validity of the agreement a jury was empaneled in the county judge's court. It is unnecessary to discuss the evidence in detail in view of the theory upon which the court submitted the case to the jury. The trial judge charged the jury, in effect, that at the time the pre-nuptial agreement was executed the parties occupied a confidential relationship to each other which raised a presumption against the validity of the contract, casting the burden upon the husband's executors to overcome the presumption. The applicability of the doctrine of presumed undue influence arising out of a fiduciary relationship is the main point to this case. The parties, although they afterward married and the marriage was contemplated when the contract was executed, were not engaged to be married until some months after the pre-nuptial agreement was made.

Professor Pomeroy has warned of the danger of confusion in considering this doctrine of presumed undue influence. To repeat the following from Pomeroy's Equity Jurisprudence, 5th ed., will serve a good purpose here—

§ 955. It is of the utmost importance to obtain an accurate conception of the exact *circumstances* under which the equitable principle now to be examined applies; otherwise the entire discussion of the doctrine will be confused and imperfect. In the various instances described in the preceding paragraphs there has been an *actual* undue influence consciously and designedly exerted upon a party who was peculiarly susceptible to external pressure on account of his mental weakness, old age, ignorance, necessitous condition, and the like. The existence of any fiduciary relation was unnecessary and immaterial. The undue influence being established *as a fact*, any contract obtained or other transaction accomplished by its means is voidable, and is set aside without the necessary aid of any presumption. The single circumstance now to be considered is the existence of some fiduciary relation, some relation of confidence subsisting between two parties. No mental weakness, old age, ignorance, pecuniary distress, and the like, is assumed as an element of the transaction; if any such fact be present, it is incidental, not necessary, — immaterial, not essential. Nor does undue influence form a necessary part of the circumstances, except so far as undue influence, or rather the ability to exercise undue influence, is implied in the very conception of a fiduciary relation, in the position of superiority occupied by one of the parties over the other, contained in the very definition of that relation. This is a most important statement, not a mere verbal criticism. Nothing can tend more to produce confusion and inaccuracy in the discussion of the subject than the treatment of actual undue influence and fiduciary relations as though they constituted one and the same doctrine.

§ 956. It was shown in the preceding section [sections 901 et seq.] that if one person is placed in such a fiduciary relation towards another that the duty rests upon him to disclose, and he intentionally conceals a material fact with the purpose of inducing the other to enter into an agreement, such concealment is an actual fraud, and the agreement is voidable without the aid of any presumption. We are now to view fiduciary relations under an entirely different aspect; there is no intentional concealment, no misrepresentation, no actual fraud. The doctrine to be examined arises from the very conception and existence of a fiduciary relation. While equity does not deny the possibility of valid transactions between the two parties, yet because every fiduciary relation implies a condition of superiority held by one of the parties over the other, in every transaction between them by which the superior party obtains a possible benefit, equity raises a presumption against its validity, and casts upon that party the burden of proving affirmatively its compliance with equitable requisites, and of thereby overcoming the presumption. One principle underlies the whole subject in all its applications; and this principle may be stated in a negative and in an affirmative form. Its negative aspect cannot be better expressed than in the following language of a most able judge in a recent decision: "The broad principle on which the court acts in cases of this description is, that wherever there exists such a confidence, of whatever character that confidence may be, as enables the person in whom confidence or trust is reposed to exert influence over the person trusting him, the court will not allow any transaction between the parties to stand, unless there has been the fullest and fairest explanation and communica-

tion of every particular resting in the breast of the one who seeks to establish a contract with the person so trusting him." The principle was affirmatively stated with equal accuracy in the same case on appeal, as follows: "The jurisdiction exercised by courts of equity over the dealings of persons standing in certain fiduciary relations has always been regarded as one of a most salutary description. The principles applicable to the more familiar relations of this character have been long settled by many well-known decisions, but the courts have always been careful not to fetter this useful jurisdiction by defining the exact limits of its exercise. Wherever two persons stand in such a relation that, while it continues, confidence is necessarily reposed by one, and the influence which naturally grows out of that confidence is possessed by the other, and this confidence is abused, or the influence is exerted to obtain an advantage at the expense of the confiding party, the person so availing himself of his position will not be permitted to retain the advantage, *although the transaction could not have been impeached if no such confidential relation had existed.*"

There are two kinds of circumstances which will create the presumption. The first depends merely on the relationship of the parties to the transaction falling into a predetermined category, i.e., attorney and client. Where the client has conveyed land to his lawyer the doctrine conclusively presumes that the lawyer occupied the superior or dominant position and was thereby in a position (whether exercised or not) to exert influence upon the client for the lawyer's benefit. In the second group fall those where there actually is confidence reposed on one side and the resulting superiority and influence on the other, as was stated in the quotation from Pomeroy. An excellent example of this group is contained in Quinn v. Phipps (Fla.), 113 So. 419, dealing with a real estate broker and the vendee (not the vendor, the broker's employer). The peculiarity of the first type is that no proof of actual confidence reposed is necessary; this is presumed and *conclusively* presumed to be present in all cases of transactions between persons in certain legal categories. There is danger of confusing the presumption of a confidential relationship and the presumption of undue influence. While proof is admissible to overcome the latter presumption, this is not true as to the former. The law admits the possibility of a fair transaction between attorney and client, or husband and wife, but it does not admit the possibility that a lawyer has not, in fact, been the dominant party in the attorney-client relationship. This requires caution in the limitation of these categories to which such drastic consequences follow. To permit the presumption to be created in this fashion (rather than requiring proof of a confidence reposed) the law is saying that the opportunity to abuse confidence automatically follows in certain categories and so proof (beyond that of merely showing the rela-

tionship) is superfluous. One of these categories is husband and wife. Let the wife complain of a transaction with her husband and the presumption attaches. She need not prove actual dominance. The law presumes this and attaches the presumption of invalidity as a consequence. This proposition has been stated and followed in Florida; in Horney v. Rhea (Fla.), 12 So. 2d 302, as to the agreement to take under husband's will, and Weeks v. Weeks (Fla.), 197 So. 393, as to a separation agreement. The doctrine has not been applied in Florida to contracts between unmarried persons, either engaged or not engaged to be married. Cases outside the state generally put engaged persons in the category of married ones as a confidential relationship. 17 Am. Jur. 774. As to persons not engaged there is a division, although I believe the weight of authority does not regard non-engaged persons as occupying a fiduciary relationship. I find no difficulty in joining the latter group, of which an example is Williamson v. First National Bank, (W. Va.), 164 S. E. 777. Supporting the contrary view is Levy v. Sherman (Md.), 43 Atl. 2d 25. This case makes what I think are false assumptions as to the universal inferiority of women.

It is not necessary to repudiate the doctrine of presumed undue influence as to transactions between husband and wife, but I suggest that since changed social conditions have vastly weakened the assumptions upon which the doctrine rests, there should be no extension, by analogy, to other relationships, such as we are presently concerned with. Without doubt, the husband was the dominant party, businesswise, in virtually all marriages a few centuries ago. The status of married women was a sensible result of an actual condition in which the woman was expected to be ignorant and subservient and doubtless ably filled the role. It would be unnecessarily tedious to recite all the legal consequences of this concept of the inferiority of married women. While sex seems presently as important as in Lord Coke's day, and we can safely predict that it is here to stay, it has lost much of its former potency in purely property transactions. The various married women's acts which have busied legislatures for a century are not the cause, but are merely a recognition of something approaching business equality between the sexes. It is hard to reconcile the provisions of our own last statute, sections 708.08, 708.09 and 708.10, Florida Statutes 1951, with the notion that the husband is presumed, conclusively at that, to be able to dominate his wife. Every one is familiar with many instances in which the contrary seems to be true.

If we in Florida were considering the matter for the first time we might well hesitate before we asserted a legal doctrine founded

upon long changed social conditions. We might prefer to let the presumption, if there is to be one, rest upon proof of domination rather than mere proof of sex. But assuming that the husband and wife relationship is sufficient per se to prove the dominant position of the male, there are, I think, impregnable reasons for excluding non-engaged persons from these consequences. Even if we must assume that all married women, or all engaged women, will sign, without question, virtually anything her husband or fiancé sticks in front of her, there is no point in indulging in such an assumption as to persons who have not yet decided to marry each other, even though they contract (as to property in lieu of dower) in contemplation of marriage. It can hardly be said of a woman who has refused to become committed to marriage that she *necessarily* is in a position to be put upon financially by a man she decides afterwards to marry. Of course, she *may* be in such a position. As already said, in *this or any other relationship,* a confidential relationship may exist, but the present case was decided on the proposition that *without proof,* except that marriage was contemplated by the parties, the confidential relationship existed.

It seems to me that the courts should be extremely cautious in their recognition of ready-made categories as creating the confidential relationship (and the consequent presumption of undue influence). We should be careful with a doctrine which substitutes assumptions for facts. To say that *all instances* of transactions within a given category must have such rigorous consequences, is a most impelling reason for insisting that no category be recognized which is based on false assumptions. I assert confidently that a woman who has refused to become engaged is *not necessarily* in a position to be imposed on by the man. Whether she is, or whether she is not, depends on the facts of the particular case. In our present case the jury were, in effect, told that it is wholly immaterial whether Mr. Selikin dominated Mrs. Gottgetreu, or vice versa, or neither. The burden of disproving undue influence was put on the executors, regardless of what the jury might have thought on the subject of actual domination.

The widow has argued strenuously that the husband's executors could not show the non-engagement of the parties since the executors offered in evidence, without reservation, the ante-nuptial agreement, which recited the engagement. It seems to me that the rule of non-impeachment of one's own document has no application here, where the evidence in contradiction to the recital comes from the widow and on direct examination by her own counsel at that. The rule on which the widow relies is, like the statute of frauds, a shield not a sword.

Since one against whom the presumption is claimed always has the opportunity to overcome it, it should not be lightly thought that whether the presumption rests upon the facts of the case or upon the parties falling into a category, makes no practical difference. We must realize that by aid of the presumption a transaction may be held invalid because the defendant has no means, because of death for instance, of disproving undue influence. It is of the utmost importance that these consequences attach to genuine and not merely fictitious fiduciary relationships.

The plaintiff has the opportunity of proving the facts (if sufficient) which in the particular case shows a confidential relationship in which the plaintiff was the subservient party, having the customary burden of proof, and *then* have the benefit of the presumption of invalidity casting the burden on the other party to show the equity of the transaction. Or, if the facts do not warrant a finding of a confidential relationship the plaintiff has the opportunity of showing the inequity of the transaction, without the aid of any presumption, as in ordinary cases where a person asks to be relieved of the burden of a contract alleged to be fraudulent. There is evidence in this case warranting the submission to a jury of both of these theories.

The other point to this case concerns the applicability of the principle of estoppel. The opportunity to disprove the widow's claim is obviously affected by the death of a contracting party. Were the husband alive the court would have his version of the transaction as well as the wife's. When the latter waits until after death has shut the mouth of her husband before complaining of the latter's fraud, certainly positions have changed. Whether, before this, the wife learned of the true state of affairs, is a question of fact. There was ample testimony to support the conclusion that the widow did learn of the extent of her husband's assets long before his death. The jury should have been charged that if they so found, the widow could not now repudiate her contract. 31 C. J. S. 347.

I am sure there would have been no difficulty with the principle of estoppel except for the trouble with the doctrine of presumed undue influence. I am inclined to believe that the trial judge was consistent in declining to charge on estoppel in view of his charge on presumed undue influence. For estoppel to apply the widow must be free of the domination of the husband in order to make a choice of repudiation or ratification, a fact already conclusively presumed to the contrary the jury was charged. As I see it then,

the sole difficulty in the case lies in the applicability of the presumed confidential relationship. If that is treated as indicated there is obviously room for the principle of estoppel and on a new trial this should be included in the charge.

The judgment appealed from is reversed, with direction to grant a new trial.